UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| CHINA FISHERY GROUP LIMITED (CAYMAN), *et al.*, | : | Case No.16-11895 (JLG) |
| | : | (Jointly Administered) |
| Debtors. | : | |

------------------------------------------------

### DECLARATION OF NG PUAY YEE PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK AND IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS AND APPLICATIONS

I, **NG PUAY YEE**, hereby declare as follows:

1.     I am the Managing Director of Pacific Andes International Holdings Limited ("**PAIH**") and the Chief Executive Officer of China Fishery Group Limited ("**CFGL**"). PAIH is the indirect parent of CFGL. CFGL is the direct or indirect parent of Smart Group Limited ("**Smart Group**"), Protein Trading Limited ("**Protein Trading**"), South Pacific Shipping Agency Limited ("**SPSA**"), CFG Peru Investments Pte. Ltd. ("**CFG Peru Singapore**"), China Fisheries International Limited ("**CFIL**"), Growing Management Limited ("**Growing Management**"), Chanery Investment Inc. ("**Chanery**"), Champion Maritime Limited ("**Champion**"), Target Shipping Limited ("**Target Shipping**"), Fortress Agents Limited ("**Fortress**"), CFGL (Singapore) Private Limited ("**CFGLPL**") and Ocean Expert International Limited ("**Ocean Expert**," and collectively with CFGL, Smart Group, Protein Trading, SPSA, CFG Peru Singapore, CFIL, Growing Management, Chanery, Champion, Target Shipping, Fortress, CFGLPL, the "**CF Group Debtors**"). PAIH is an indirect parent of both the CF Group (as defined and described below) and Super Investment Limited ("**Super Investment**").   N.S. Hong Investment (BVI) Limited ("**NS Hong**", collectively with PAIH, Super Investment and the CF Group Debtors, the "**Debtors**") is the majority shareholder of PAIH.

1

2.      On June 30, 2016 (the "**Commencement Date**"), each of the Debtors filed a petition under Chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). In addition to the cases set forth above, contemporaneously with the filing of the cases by the Debtors, CFG Investment S.A.C., Corporation Pesquera Inca S.A.C. and Sustainable Fishing Resources SAC each filed a petition under Chapter 15 of the Bankruptcy Code. Pacific Andes Resources Development Limited ("**PARD**"), an indirect subsidiary of PAIH and a debtor in a case filed in the Republic of Singapore, may also seek recognition before this Court.

3.      I submit this Declaration on behalf of each of the Debtors pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**") for the purpose of apprising the Court and parties in interest of the circumstances that compelled the commencement of the chapter 11 cases and in support of (i) the Debtors' chapter 11 petitions (the "**Petitions**") and (ii) the motions and applications that the Debtors have filed with the Court, including, but not limited to, the "first-day motions" (the "**First-Day Motions**").

4.      I have been employed by the Pacific Andes family of companies, which is a business group comprised of each Debtor, along with the non-Debtor entities identified in **Exhibit A** hereto (collectively, the "**Pacific Andes Group**"), and of which the Debtors are key components since 1995. I have been executive director of PAIH since 2001 and was appointed as an executive director of CFGL on December 15, 2015. I have been Managing Director of PAIH and Chief Executive Officer CFGL since December 15, 2015 and February 26, 2016, respectively.

5.      Prior to my appointment as the Managing Director of PAIH, I was the executive director responsible for global sales and marketing for the Pacific Andes Group.

2

My duties also included group wide global raw material sourcing, procurement and supply chain functions.

6.      When I first joined the Pacific Andes Group in 1995, I led the sales and marketing division of the group and focused on deploying a global marketing strategy for the group. When I was promoted to executive director of the Pacific Andes Group, my responsibilities expanded to include the management and oversight of the Sales and Marketing and Procurement departments of the Pacific Andes Group. During my tenure in this role, sales of the Pacific Andes Group grew from $80 million to $400 million and the customer base increased tenfold. During my term we expanded markets served by the Group and now serve over 30 countries around the world. This was achieved partly through broadening the species processed and traded from a single species, Alaskan Pollock, to multiple species including Cod, Salmon, Halibut and other species of ground fish.

7.      As head of the Procurement Department, I managed a budget of over $100 million per year and was responsible for the purchase of raw fish from Europe and the United States for processing in plants in China as well as the acquisition of feedstock for the processing plants in Europe.

8.      In addition, I was responsible for the introduction of sustainable practices at the Pacific Andes Group. As part of this initiative, we moved away from processing species considered to be unsustainable and focused on promoting MSC (Marine Stewardship Council) certified products. In addition, we became a strong proponent of the MSC by encouraging customers to accept MSC products in the US and EU as well as helping raise awareness of MSC certified species in Hong Kong, China, and other Asian markets. In these roles, I implemented policies and procedures that established the hallmarks of Pacific Andes Group, which are consistently high quality products and on time delivery. As a result, our market presence continued to expand.

3

9.    Since my appointment as Managing Director of PAIH and Chief Executive Officer of CFGL, I have been responsible for the overall executive management of the entire Pacific Andes Group.  This has included building and consolidating the management team across all functions, and taking responsibility for the performance and finances of the Pacific Andes Group's global operations.  I am also primarily responsible for negotiating with creditors of the Pacific Andes family of companies.  In this role, given the financial difficulties faced by the Pacific Andes Group since 2015, I have devoted substantial time and resources in an attempt to stabilize the company and its operations.

10.    I earned a Bachelor of Arts degree, majoring in mass communications, from the Indiana University at Bloomington.  I am active in the fishing industry associations including the Groundfish Forum, of which I am a member of the Executive Committee. I am also a member of the National Fisheries Institute of the United States. I am active in the business community in Hong Kong, having held the position of Chairperson of the Young President's Organization (2015-16) and Entrepreneurs' Organization (2008-09).  I currently reside in Hong Kong and my office is located in the Hong Kong office of PAIH.

11.    Although the Debtors are each independent legal entities, given my duties and the coordination of the businesses within the Pacific Andes Group, I have become familiar with the day to day operations, business and financial affairs of each of the Debtors.

12.    In my role as Managing Director and/or Chief Executive Officer of the direct or indirect parent of each of the Debtors, and with the assistance of the Debtors' employees and advisors, I have been extensively involved in the Debtors' Chapter 11 preparations and the events leading up to the Commencement Date.  I also have extensive knowledge of, and experience with, the business and financial affairs of each of the Debtors, the industry in which the Pacific Andes Group operates, and the operations and finances of the Pacific Andes Group.  I am authorized to submit this Declaration on behalf of each of the Debtors.

4

13.     Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the operations of the Pacific Andes Group and the fishing industry.  If called upon to testify, I would testify competently to the facts set forth in this Declaration.  Unless otherwise indicated, the financial information contained herein is unaudited and provided on a consolidated basis for the Pacific Andes Group, which includes certain non-Debtor entities.

### I.     OVERVIEW OF THE DEBTORS AND THEIR BUSINESSES AND THE REASONS FOR THE CHAPTER 11 CASES

#### A. Introduction

14.     As set forth in greater detail below, the Debtors are comprised primarily of investment holding companies[1] and non-operating companies that previously were in the business of trading frozen seafood products or providing freight service.[2]  The Debtors also include: Protein Trading, a fishmeal trading company; SPSA, which provides shipping agency services; CFGLPL , a property investment company; and CFIL.

15.     The Debtors' corporate structure is complex and somewhat vertical – meaning one Debtor is owned directly or indirectly by another Debtor, which, in turn is owned, directly or indirectly by another Debtor.  See **Exhibit A** hereto.

16.     Most of the Debtors are primary or secondary obligors on one or more of the unsecured credit facilities that are described in Section II.C. below.  As such, except where a parent guaranty exists, the credit facility for one Debtor is structurally subordinated to the

---

[1]   The Debtors that are holding companies are NS Hong, PAIH, Super Investment, CFGL, Smart Group, and CFG Peru Singapore.

[2]   These dormant Debtors previously operated as trading companies:   Chanery; Champion; Growing Management; Fortress; and Ocean Expert.  Target Shipping previously provided freight services and ceased operations in July 2015.

credit facility of that Debtor's direct or indirect subsidiaries, which, in turn, is structurally subordinated to the credit facility of that Debtor's direct or indirect subsidiaries.

17.    The Debtors' value is derived primarily from their direct or indirect interests in the CF Group, which group of companies includes Debtors and non-Debtors, that comprise a large part of the Pacific Andes Group, and is operated as a separate business within the Pacific Andes Group.

18.    As set forth below, the value of the CF Group is in jeopardy as a result of the aggressive and improper acts by certain lenders and natural events (El Niño) that together have triggered a liquidity crisis.

19.    A small group of lenders have grown impatient with (or are outright hostile to) a sale process that the Debtors commenced pre-petition and are threatening to enforce their rights against their respective Debtor obligors.  Due to the Debtor's corporate structure, one lender's enforcement efforts would enable that lender to control its obligor's direct and indirect subsidiaries, displace management, and potentially control the CF Group.  None of the lenders have an interest in maximizing the value of the CF Group assets; rather, each lender is only interested in realizing enough value from the CF Group to satisfy its indebtedness.  As a result, creditors that are owed money at the subsidiary level are pressing for an expedited sale of the CF Group, which would enhance their likelihood of repayment in full.  However, a fire sale of the CF Group at depressed values would prejudice creditors of the Debtors that are the direct or indirect owners of the CF Group.

20.    Therefore, the purpose of these chapter 11 cases is simple -- to provide the Debtors with a breathing spell in order to implement a restructuring of their businesses and utilize the automatic stay to prevent creditors from forcing a fire sale, which would preclude structurally subordinated creditors and shareholders from realizing value.

21.     This Declaration provides an overview of the business of the Pacific Andes Group and discusses the factors that led to the Commencement Date and the need for a restructuring of the business. I have reviewed the Debtors' Petitions and First-Day Motions, or have otherwise had their contents explained to me, and it is my belief that the relief sought therein is essential to ensure the uninterrupted operation of the Debtors' business and success of the Debtors' reorganization.

22.     Section I herein describes the reasons for the Chapter 11 Cases and the history and nature of the Pacific Andes Group's business. Section II describes the Pacific Andes Group's organizational structure, financial position, performance and prepetition indebtedness. Section III describes the circumstances that have led to the commencement of the Chapter 11 Cases. Section IV describes the relief sought by the Debtors in each of the First-Day Motions. Section V identifies the attached schedules of information as required by Local Bankruptcy Rule 1007-2 to the extent not otherwise identified herein.

### B. Overview of Reasons for Chapter 11 Cases.

23.     The filing of these cases has been caused by a series of events, some of them natural and others man-made. These events will be discussed in greater detail below. However, by way of overview, the issues facing the CF Group include a diminution in fish stocks caused by the weather phenomenon known as El Niño, a suspension by Peru's fisheries' authority of Peru's second anchovy season in 2014, which effectively suspended the operations of a division of the CF Group, improper actions by certain creditors that caused the CF Group, at a time when its resources were strained, to face an immediate and catastrophic liquidity crisis that has placed the CF Group, its employees, the communities in which it maintains its facilities, and its shareholders and creditors on the precipice of disaster and in imminent risk of losing their investments, careers and way of life.

24.    As discussed in greater detail below, on November 25, 2015, three joint provisional liquidators (the "**JPLs**") were appointed on an *ex parte* basis over CFGL and CFIL, two of the Debtors in these cases. On January 5, 2016, their appointment was quashed by the very court that appointed them due to a failure by the petitioning party, The Hongkong and Shanghai Banking Corporation Limited ("**HSBC**"), to have presented any credible evidence supporting the appointment of the JPLs. Moreover, the Court found that the evidence that HSBC had submitted was stale and did not merit the appointment of JPLs in any way.

25.    Unfortunately, and notwithstanding the JPLs' lack of authority or power to take such actions, the JPLs forced themselves into the business and offices of certain subsidiaries of CFGL. It is important to note that in taking such actions, the JPLs acted with total disregard of the laws of the countries under which such subsidiaries were organized and operated and in flagrant violation of the rights and interests of the subsidiaries' employees, creditors and shareholders. Specifically, the JPLs attempted to confiscate computers and documents that were not property of CFGL or CFIL and met with (i) employees, (ii) creditors, (iii) vendors, (iv) investors, and (v) banks with which the CF Group, including certain of the Debtors, had critical relationships. Unfortunately, but not unexpectedly, the appointment of the JPLs and their interference with the business and operations of the CF Group have had severe negative impacts on the CF Group and the Pacific Andes Group as a whole. In particular and given the nature of the JPLs' statements and actions, creditors, including certain inventory finance providers and warehouse operators, are no longer willing to work with the Debtors. Consequently, there has been a severe liquidity crisis and increased strain on the Debtors' limited resources and staff.

26.    By the time the JPLs were discharged, many creditors, in particular the banks that provided the CF Group with inventory financing and certain critical vendors, were left

8

questioning the viability of the CF Group. As a result, the CF Group (and consequently, the Pacific Andes Group which holds the majority of equity interests in the CF Group directly and indirectly) has been suffering through a deepening liquidity crisis.

27.    In what was perhaps the most outrageous and devastating action taken by the JPLs, the JPLs insisted on meeting with two potential investors who had entered into two Memoranda of Understanding that would have resulted in (i) a partial sale of the CF Group and (ii) all creditors of the CF Group (and a substantial proportion of creditors of the Pacific Andes Group) being paid in full. After the appointment of the JPLs, the potential investors were unwilling to proceed and broke off all negotiations.

28.    The Debtors believe that the improper actions taken in this regard may give rise to causes of action under the laws of various countries, including the United States. These causes of action constitute valuable property of the Debtors' estates. As part of these cases, the Debtors will pursue a coordinated effort to assure that the stakeholders, who have been so egregiously harmed by the reckless and illegal actions of various parties, including the JPLs, are made whole.

### C. History of the Pacific Andes Group

29.    The Pacific Andes Group is the twelfth largest seafood company in the world and one of the world's foremost vertically integrated seafood companies. The Pacific Andes Group provides seafood products to leading global wholesalers, processors and food service companies and has operations across the seafood value chain. As part of its business, the Pacific Andes Group engages in harvesting, sourcing, ocean logistics and transportation, food safety testing, processing, marketing and distribution of frozen fish products, as well as the production and distribution of fishmeal and fish oil. The Pacific Andes Group's businesses span the globe with major operations in the People's Republic of China ("**China**"), the

United States and Peru, including processing businesses in China, Germany, France, the United States and Peru.

30.    The Pacific Andes Group began in 1986 when Ng Swee Hong and his sons established a small frozen seafood trading business in Hong Kong's Western district. Initially, the company marketed shrimp, squid and scallops from China for export to the United States and Europe.    In the years immediately following its formation, the Pacific Andes Group expanded its footprint by building relationships with fishing companies across East Asia.    The company further expanded by providing shipping agency services (such as bunker fuel and provisioning services) to fish suppliers, thereby establishing what would become the foundation of its supply chain management business.    The Pacific Andes Group next entered the frozen whitefish market.    In this market, the Pacific Andes Group began producing fish fillets through subcontracted factories in China and was among the first to enter the China fish fillet market.

31.    As the Pacific Andes Group grew rapidly in the early 1990s, PAIH, the holding company of the Pacific Andes Group, was publicly listed in 1994 on the Main Board of The Stock Exchange of Hong Kong Limited (the "**HK Stock Exchange**") under the ticker PAIH.    Two years later in 1996, PARD, was listed on the mainboard of the Singapore Exchange Securities Trading Limited (the "**Singapore Exchange**") under the ticker P11.SI.

32.    In 2003, in light of increasing concern regarding food safety and traceability in China, the Pacific Andes Group established China's first independent seafood testing laboratory, Sino Analytica, which further underscored the Pacific Andes Group's on-going commitment to and role as a leader in China's food processing industry.

33.    In 2004, the Pacific Andes Group acquired a strategic stake in the CF Group,[3] which extended the Pacific Andes Group's reach into industrial fishing. The CF Group has rights to fish in some of the world's most lucrative fisheries, including the anchovy fishery in Peru. In 2006, CFGL was listed on the Singapore Exchange under the ticker CFG:SP and CNFG.SI. The CF Group sources, harvests, onboard-processes and delivers a high quality catch of mackerel to consumers around the world. The CF Group is also one of the leading producers of fishmeal and fish oil through its processing plants located along Peru's coast.

### D. The Fishing Business of the Pacific Andes Group

34.    The Pacific Andes Group is principally engaged in global sourcing, transportation, logistics and supply of frozen seafood products to the international markets, in particular to China. The main production base of the Pacific Andes Group is located in Qingdao, Shandong Province in China. This factory is one of the largest fish fillet processing facilities in the world. The Pacific Andes Group, through the subsidiaries of PAIH, purchases fish from various sources in various countries, and processes fish into fish fillets in its Qingdao factory. The Pacific Andes Group is one of the largest exporters of fish fillets to China.

35.    The Pacific Andes Group has investments in various fish processing companies, including a 60% equity interest in National Fish & Seafood Inc, a company based in Massachusetts, which processes and distributes frozen seafood products to customers in the United States. The Pacific Andes Group also has a 19% equity interest in the Pickenpack group of companies, comprised of Pickenpack Holding Germany GmbH (the holding company of the Pickenpack Germany Group), Pickenpack Production Lüneburg GmbH, TST

---

[3]    Specifically, Super Investment (an indirect subsidiary of PAIH) currently holds 69.7% of CFGL and Golden Target Pacific Limited (another indirect subsidiary of PAIH) currently holds 0.8% of CFGL. In addition, PAIH indirectly owns approximately 38% of CFGL through its holdings of other companies and NS Hong indirectly owns approximately 21% of CFGL.

The Seafood Traders GmbH and Pickenpack Europe GmbH (collectively, the "**Pickenpack Germany Group**"). The Pickenpack Germany Group produces frozen seafood in Germany. The Pickenpack Germany Group owns two factories in Germany, one in Lüneburg and one in Riepe. As a result of the appointment of the JPLs, trade suppliers withdrew extensions of credit that were made available to the Pickenpack Germany Group which led to each of the companies being over-indebted under the insolvency laws of Germany. Each of the companies in the Pickenpack Germany Group therefore filed for insolvency at the Lüneburg court on December 3, 2015.

36.     The Pacific Andes Group also held a 19% equity investment in a French company, Gelmer SAS ("**Gelmer**", together with the Pickenpack Germany Group, "**Pickenpack Europe**") which owned a seafood production factory in France. However, as a result of the insolvency filing by the Pickenpack Germany Group, Gelmer's own near term liquidity constraints and the financial distress that was being faced by the Pacific Andes Group, the management of Gelmer was forced to filed for an insolvency process in France at the courts of Boulogne-Sur-Mer. As part of the conciliation procedure, Gelmer was divested to Greenland Seafood Europe GmbH, and thus is no longer part of the Pacific Andes Group.

**E.     Peruvian Operations of the Pacific Andes Group**

37.     The CF Group is a significant part of the Pacific Andes Group. The CF Group holds the largest quota for the harvest of anchovy in Peru. Further, the CF Group is one of the world's largest producers of fishmeal and fish oil in the world, producing approximately 300,000 metric tons of fishmeal and 50,000 metric tons of fish oil which, in a normalized year, generates approximately $585 million in EBTIDA. As discussed in more detail below, the CF Group's operating assets consist of 10 plants located in 8 towns and villages in Peru and 66 vessels ranging in size from 197 to 807 tons. The CF Group employs approximately

2,800 people. In many of the towns in which the CF Group operates, it is the largest employer and the lifeblood of the community.

38.     The CF Group sources, harvests, on board-processes and delivers high-quality fish products to consumers around the world, and engages in fishing, fishmeal and fish oil processing and production in Peru for worldwide distribution. The main operating entities of the CF Group's Peruvian operations are CFG Investment S.A.C. ("**CFG Investment**") and Corporacion Pesquera Inca S.A.C. ("**Copeinca**", together with CFG Investment, "**CFG Peru**"), each of which is the subject of a petition filed with this Court under Chapter 15 of the Bankruptcy Code.

39.     CFG Peru owns 10 processing plants (of which 7 are currently operating). These plants are strategically located along the coast of Peru to maximize efficiency. The following 5 processing plants are located along the northern and central coast of Peru, where fishing is currently permitted during 6 months of the year: (a) Chancay plant (80 km north of Lima), (b) Chicama plant (610 km north of Lima), (c) Chimbote plant (450 km north of Lima) (d) Pisco plant (250 km south of Lima) and (e) Tambo de Mora (200 km south of Lima).

40.     The following 2 processing plants are located along the southern coast of Peru, where fishing is currently permitted throughout the year: (a) La Planchada plant (760 km south of Lima), and (b) Ilo plant (1,170 km south of Lima).

41.     The plants are strategically located to minimize the distance and travel time from the fishing grounds to the plants. There are multiple benefits brought about by this, including reduced fuel consumption and preservation of the quality of the catch. The CF Group also owns inactive processing plants that are used to store, repair and maintain inactive fishing vessels and to house certain administrative offices.

42.    Fishmeal is a high-protein, nutrition-rich substance produced by cooking, pressing, drying and grinding fish and fish parts. Fishmeal is used in animal feed and fertilizer. Fish oil is a by-product of fishmeal that is obtained by pressing cooked fish during the fishmeal production process. The fishmeal and fish oil produced from the Peruvian anchovy harvested by CFG Peru are of high-quality and have been in great demand in recent years as a superior source of protein.

43.    The largest use of fishmeal is in aquaculture. The continued sustainable production of fishmeal and fish oil and the export of these products globally, is critical to the growth of global aquaculture and livestock production. The CF Group's principal markets for fishmeal and fish oil are China, Japan, South Korea, Southeast Asia and Europe. Continued population growth and rising standards of living worldwide have and will continue to drive global demand for meat and fish and thus will increase the demand for fishmeal and fish oil, particularly in China. Future growth in seafood production is expected to come from aquaculture, with the OECD-FAO[4] predicting aquaculture will grow in excess of 2.5% per annum through 2024. This growth is expected to accelerate demand for meat and fish and thus will increase the demand for fishmeal and fish oil, given that they are essential feed stock for aquaculture. In line with the foregoing, the price of fishmeal has been on an upward trend over the last 10 years. The continued sustainable production of fishmeal and fish oil and the export of these products globally is critical to the growth of global aquaculture and livestock production.

44.    The CF Group produces all of its fishmeal and fish oil using anchovy (a) harvested by CFG Peru within Peru's exclusive economic zone pursuant to quota shares allocated to the vessels owned or operated by CFG Peru pursuant to Peru's Individual

---

[4]    Organization for Economic Co-operation and Development (OECD) and the Food and Agriculture Organization (FAO) of the United Nations.

Transferable Quota ("**ITQ**") system and (b) purchased from third parties. Substantially all the anchovy harvested by CFG Peru in Peru is used as raw material in its fishmeal operations. The catch volumes of anchovy are affected principally by fishing quotas and seasons imposed by the Peruvian government, as well as environmental factors and weather phenomena, such as El Niño and La Niña. The impact that these environmental factors have on businesses in Peru is well recognized under Peruvian law and are integrated in legal and business practices in Peru. For example, credit documents governed by Peruvian law pursuant to which onshore Peruvian financiers provide financing typically contain an "El Niño" clause, under which debtors have an extension of time to repay credit facilities advanced to them if unforeseen circumstances such as the El Niño phenomenon impacts the industry. Under the Peruvian fishery regulatory regime, the Peruvian government limits fishing of anchovy in northern and central Peru to certain periods, generally April to July and November to December. Although harvesting of anchovy in southern Peru is permitted year-round, rough seas and unfavorable fishing conditions due to the migratory pattern of Peruvian anchovy make this region less attractive for industrial fishing.

45.     The Peruvian fishing industry is regulated by the Ministry of Production of the Republic of Peru, which determines the start and duration of each fishing season as well as the total allowable catch per season. Since April 2009, Peru has been operating under the ITQ system; a quota share system under which licensed vessels of fishing companies are allocated a share of each season's total allowable catch (which is regulated with a view to maintaining sustainable fishing). Under Peru's ITQ system, the CF Group (through CFG Investment and Copeinca) currently holds the largest quota of any fishing company for anchovy fishing in Peru – 16.90% in the northern and central zone and 14.77% in the southern zone. The CF Group's fishmeal production, through CFG Peru, represented approximately 22.5% of the total fishmeal production in Peru for 2015. The CF Group is one

of the largest fishmeal producers in the world producing approximately 16.42% of the world's fishmeal.

46.    Product mix is not a significant factor in the results of operations from the fishmeal operations.   As explained above, fish oil is produced as a by-product. Approximately 22-25% of the weight of the fish is recovered in fishmeal.   Approximately 1-6% of the weight of the fish is recovered in fish oil, depending on the maturity of the fish and when in the fishing season the fish is harvested.   The volumes and quantity of fishmeal and fish oil produced from a given amount of anchovy are a function of the amount and quality of the anchovies.   The volume of fishmeal and fish oil produced along with the price received for such products directly affects the CF Group's revenue.   Although the production of fishmeal and fish oil is the main source of revenue for the CF Group, a small portion of the CF Group's revenues can be attributed to the sale of jack mackerel, which is used for human consumption and is caught in Peruvian waters, as well as sales of anchovy to third-parties.

47.    CFG Investment and Copeinca have the same management team and engage in similar businesses, i.e., anchovy fishing and the production of fishmeal and fish oil from their anchovy catch.   Both companies own fishing vessels and processing plants.   To maximize efficiency, CFG Investment and Copeinca cross-utilize each other's processing plants.   Thus, a vessel of one company may utilize a plant of the other company if it has available capacity and is closer.   By utilizing the closest available plant, fuel consumption (and operating costs) are reduced and the freshness and quality of the catch is maintained at the highest possible level.

48.    CFG Peru has a fleet of approximately 76 vessels, each of which is owned or leased by CFG Investment or Copeinca and has fishing permits with anchovy quotas allocated to them under the ITQ system ("**Quota Vessels**").   The Quota Vessels are actively deployed and are operative in connection with the fishmeal and fish oil business.   The fishing

vessels undergo proper maintenance and repairs twice annually in accordance with a maintenance plan. Every 24 months, each fishing vessel undergoes major maintenance including repairs to (and overhauling of) the engines, gearboxes for the propulsion system, fishing nets, hydraulic equipment and other key fishing equipment.

49.     In addition to the fishmeal operations, the CF Group also has a fleet business that it operates through Sustainable Fishing Resources S.A.C. ("**Sustainable Fishing Resources**"), which owns a fleet of 7 fishing vessels used to catch blue water fish for human consumption consisting primarily of mackerel and jack mackerel. The fleet includes the largest factory vessel in the world, the Damanzaihao (which, as discussed below, is currently suspended from fishing).

50.     The fishing vessels which Sustainable Fishing Resources utilizes to catch blue water fish for human consumption, including the Damanzaihao, are sophisticated ocean going vessels. Sustainable Fishing Resources has not operated since October 2014 when the Damanzaihao (together with 5 catcher vessels) returned to port in Peru after a voyage in the area monitored by the South Pacific Regional Fisheries Management Organization ("**SPRFMO**"). During the third commission meeting of the SPRFMO held in January 2015, the Commission designated the Damanzaihao as a vessel engaged in illegal, unreported and unregulated ("**IUU**") activities. This action resulted from regulatory and governmental investigations by the SPRFMO technical and compliance committee. On January 19, 2016, the SPRFMO imposed 2 fines in an aggregate amount of $820,141.58 on the CF Group as a result of the alleged breaches of the Peruvian fishery law in connection with the Damanzaihao. The CF Group vigorously disputed and disputes these allegations and is currently appealing this finding.

51.     In an agreed settlement, in order for the Damanzaihao to be removed from the IUU list and returned to fishing, SPRFMO stipulated that the vessel's flag state (i.e., Peru)

needed to show that it has adopted measures so that the vessel is in conformity with SPRFMO rules and will continue to effectively monitor and control the vessel's operations in the SPRFMO area.

52.     The CF Group employs more than 2,800 people, of which 2,400 employees are based in Peru including crew on the vessels who are retained by a crewing agent and not directly employed by the CF Group. Crew are generally hired on a contract basis for a term of 6 to 9 months, depending on their nationality, rank and fishing season of their destination fishing ground. The majority of the production workers at the operational processing plants are also hired on a contract basis, generally for a period of 6 months. Of the 2,400 employees, approximately 2,040 are involved in the fishmeal operations of which, approximately 1,030 are crewmen involved in the fleet operations and 1,094 are involved in the production operations. The rest of the workers are either engineers or perform administrative and/or management functions. None of the CF Group's employees are the subject of any collective bargaining agreement or are members of any union.

53.     In 2013, as part of its consolidation of operations in Peru, the CF Group purchased Copeinca for a purchase price of approximately $784 million. The acquisition of Copeinca increased the CF Group's quota by 10.7% and added 27 vessels to the fleet. Copeinca continues to be a key asset of the CF Group.

54.     <u>Other Revenue</u>. The CF Group has also entered into a joint venture with its local Namibian partner under which it invests in a horse mackerel trading business. The unaudited revenue for nine-months ending June 28, 2015 was $31 million with a net loss of $3.8 million (on an unaudited basis).

## II.    CORPORATE STRUCTURE

### A. Incorporation History

55.    PAIH was incorporated as an exempted company under the laws of Bermuda on October 6, 1993. In 1994, PAIH was listed on the HK Stock Exchange.

56.    Super Investment was incorporated as a company limited by shares under the laws of the Cayman Islands on June 13, 2000.

57.    CFGL was incorporated as an exempted company under the laws of the Cayman Islands on April 14, 2000. In 2006, CFGL was listed on the mainboard of the Singapore Exchange.

58.    Smart Group was incorporated as a company limited by shares under the laws of the Cayman Islands on June 14, 2000.

59.    CFGLPL was incorporated as a private company limited by shares under the laws of Singapore on May 22, 2007.

60.    Protein Trading was incorporated as a limited liability private company under the laws of the Samoa on October 26, 2006.

61.    SPSA was incorporated as a company limited by shares under the laws of the British Virgin Islands on May 14, 2009.

62.    CFG Peru Singapore was incorporated as a private company limited by shares under the laws of Singapore on March 3, 2006.

63.    CFIL was incorporated as a private company limited by shares under the laws of Western Samoa on February 8, 1997.

64.    Growing Management was incorporated as company limited by shares under the laws of the British Virgin Islands on October 2, 1997.

19

65.    Chanery was incorporated as an international business company under the laws of the British Virgin Islands on March 5, 2003.

66.    Champion was incorporated as an international business company under the laws of the British Virgin Islands on October 25, 2002.

67.    Target Shipping was incorporated as a private company limited by shares under the laws of Hong Kong on October 19, 2009.

68.    Fortress was incorporated as an international business company under the laws of the British Virgin Islands on January 6, 2005.

69.    Ocean Expert was incorporated as a company limited by shares under the laws of the British Virgin Islands on September 12, 2006.

70.    NS Hong was incorporated as an international business company under the laws of the British Virgin Islands on July 19, 2013.

### B. Financial Performance and Cash Position

71.    As of March 28, 2015, the Pacific Andes Group, on a consolidated and unaudited basis, held approximately $4,669 million in assets and $2,515 million in liabilities.

72.    For the fiscal year ending on September 28, 2014, the Pacific Andes Group, on a consolidated audited basis, reported revenues of approximately $1,616 million.

73.    For the fiscal year ending on September 28, 2014, the CF Group, on a consolidated audited basis, reported revenues of approximately $631 million and operating income of approximately $64 million, of which $435 million of revenues stemmed from the fishmeal operations.

74.    The most valuable assets owned by the CF Group are its Peruvian fishmeal and fish oil operations held through its interests in CFG Peru.  CFG Peru's most valuable

assets are (i) the anchovy fishing quotas that have been allotted to CFG Peru's vessels by the Peruvian government under permits issued to the Quota Vessels, (ii) the Quota Vessels that are operative; and (iii) the fishmeal processing plants including the related plant permits and equipment.

75.     As of the Commencement Date, the Debtors have approximately $4,275,607 million of cash on hand, including $1,678,007 on account with Meyer, Suozzi, English, & Klein, P.C. in New York (in the form of a retainer for the rateable account of all Debtors), $1,720,000 on account with Goldin Associates, LLC in New York and $650,000 on account with RSR Consulting, LLC.

76.     The reporting currency of the Debtors is United States Dollars. While the CF Group transacts business largely in United States Dollars, the Debtors also conduct business worldwide in various currencies including: Peruvian Nuevos Soles, Chinese Renminbi, Euros, Namibian Dollars, Norwegian Krones and Singapore Dollars.

### C. Debtors' Prepetition Indebtedness

The following summaries set forth the Debtor's major indebtedness:

77.     **Europaco Rabobank Trade Facilities.** Trade finance facilities of approximately $17,079,371.76 in outstanding principal amount (the "**Europaco Rabobank Trade Facilities**"). The joint borrowers under the Europaco Rabobank Trade Facilities are Europaco Limited ("**Europaco**"), Pacos Processing Limited ("**Pacos**"), Europaco (EP) Limited ("**EEL**"), Europaco (GP) Limited ("**EGL**"), Europaco (AP) Limited ("**EAL**"), Europaco (HP) Limited ("**EHL**"), and guaranteed by PAIH pursuant to a facility letter dated August 10, 2012 as amended by a supplemental facility letter dated July 9, 2015.

78.     **Rabobank NFS Facilities.** General banking facilities of approximately $88,562,043 in outstanding principal amount (the "**Rabobank NFS Facilities**") granted

pursuant to a facility letter dated September 10, 2013 as amended by supplemental facility letters dated December 9, 2013 and June 6, 2014. The joint and several borrowers under the Rabobank NFS Facilities are National Fish and Seafood Limited and National Fish & Seafood Inc., and the guarantor is PAIH.

79.    **Fubon Mortgage Loan.**    Mortgage loan of $12,996,000 in outstanding principal amount (the "**Fubon Mortgage Loan**") granted pursuant to a facility letter dated August 11, 2010. The borrower under the Fubon Mortgage Loan is Dynamic Choice Limited ("**Dynamic**") and guaranteed by PAIH. The Fubon Mortgage Loan is also secured by certain properties mortgaged by Dynamic in favor of Fubon Bank (Hong Kong) Limited, the lender of the Fubon Mortgage Loan.

80.    **Fubon Factoring Facilities.**    General trade facilities of approximately $11,228,000 in outstanding principal amount (the "**Fubon Factoring Facilities**") granted pursuant to a facility letter dated April 23, 2014 and renewed pursuant to a supplemental facility letter dated May 14, 2015. The borrowers of the Fubon Factoring Facilities are Europaco, EEL, EHL, EAL and Pacific Andes Enterprises (BVI) Limited, and the joint and several guarantors are PAIH and PARD.

81.    **Citic Banking Facilities.**    General banking facilities of approximately $45,412,000 in outstanding principal amount (the "**Citic Banking Facilities**") granted pursuant to a facility letter dated December 9, 2013 as amended and supplemented by a supplemental facility letter dated March 20, 2014. The borrowers under the Citic Banking Facilities are Pacos and Europaco, and the guarantor is PAIH.

82.    **Standard Chartered Banking Trade Facilities.**    Trade facilities of approximately $8,357,000 in outstanding principal amount (the "**SCB Trade Facilities**")

made available pursuant to a facility letter dated April 10, 2014. The borrower under the SCB Trade Facilities is Europaco, and the guarantor is PAIH.

83.    **Rabobank Pickenpack Facility.** An unsecured facility in the principal amount of up to €85,000,000, of which approximately €51,675,000 is outstanding (the "**Rabobank Pickenpack Facility**"). The borrowers under the Rabobank Pickenpack Facility are Pickenpack Production Lüneburg GmbH, Pickenpack Europe GmbH., TST The Seafood Traders GmbH and Gelmer, and the joint and several guarantors are Pickenpack Holding Germany GmbH and PAIH pursuant to a facility agreement dated June 24, 2015 with Deutsche Bank Luxembourg S.A., China CITIC Bank International Limited, UniCredit Bank AG, Rabobank Nederland, Rabobank Frankfurt, as lenders, Rabobank International, as agent, and Rabobank Hong Kong, as security agent.

84.    **Maybank Term Loan.** A secured facility in the principal amount of up to $100,000,000, of which approximately $95,000,000 is outstanding (the "**Maybank Secured Loan**") made available pursuant to a facility agreement dated March 21, 2014. The borrower under the Maybank Secured Loan is Pacific Andes Treasury Management Limited (a direct subsidiary of PAIH), and the joint and several guarantors are Europaco, Pacos and PAIH. The Maybank Secured Loan is secured by a lien over the entire issued share capital of Pacific Andes Food (BVI) Limited, an indirect subsidiary of PAIH.

85.    **Maybank Banking Facilities.** General revolving banking facilities of approximately $40,000,000 in outstanding principal amount (the "**Maybank Banking Facilities**") made available pursuant to a facility letter dated September 30, 2014. The borrower under the Maybank Banking Facilities is Europaco, and the guarantor is PAIH.

86.    **UOB Banking Facilities.** Banking facilities of approximately $7,020,000 in outstanding principal amount (the "**UOB Banking Facilities**") made available pursuant to a

23

facility letter dated July 9, 2015. The borrower under the UOB Banking Facilities is Europaco, and the guarantor is PAIH.

87.    **DBS Banking Facilities.**    Trade facilities and mortgage loans of approximately $24,911,000 and $32,933,000 in outstanding principal amount respectively (together, the "**DBS Banking Facilities**") granted pursuant to a facility letter dated June 25, 2014 as amended by a supplemental facility letter dated July 21, 2015. The borrower under the DBS Banking Facilities is Europaco, and the joint and several guarantors include, *inter alia*, PAIH. The DBS Banking Facilities also have the benefit of various mortgages and liens granted in respect thereof.

88.    **Agricultural Bank of China Facilities.**    Trade finance and working capital facilities of approximately $41,028,461 in outstanding principal amount (the "**ABC Facilities**"). The borrowers under the ABC Facilities are Pacific Andes Food Limited (an indirect subsidiary of PAIH, incorporated and existing under the laws of China) ("**Pacific Andes Food China**") and Qingdao Pacific Andes International Trading Co., Ltd. (an indirect subsidiary of PAIH, incorporated and existing under the laws of China) ("**Qingdao Pacific Andes China**") in respect of approximately $29,182,307 and $11,846,153, respectively. The ABC Facilities are guaranteed by PAIH and are secured by a lien on the factory of the Pacific Andes Group located in Qingdao, Shandong province in China (the "**Qingdao Factory**").

89.    **Industrial and Commercial Bank of China Facilities.**    Trade and working capital facilities of approximately $30,611,572 in outstanding principal amount (the "**ICBC Facilities**"). The borrowers under the ICBC Facilities are Pacific Andes Food PRC and Qingdao Pacific Andes PRC in respect of approximately $24,675,731 and $5,935,840, respectively. The ICBC Facilities are guaranteed by PAIH and secured by a lien on the Qingdao Factory.

24

90.    **Bank of Communications Facilities.**  Trade and working capital facilities of approximately $27,071,759 in outstanding principal amount (the "**Bank of Communications Facilities**").  The borrower under the Bank of Communications Facilities is Pacific Andes Food PRC, the Bank of Communications Facilities are guaranteed by PAIH, and are secured by a lien on the Qingdao Factory.

91.    **Citic Bank Facilities.**    Working capital facilities of approximately $29,846,153 in outstanding principal amount (the "**Citic Bank Facilities**").  The borrowers under the Citic Bank Facilities are Pacific Andes Food PRC and Qingdao Pacific Andes PRC in respect of $7,692,307 and $22,153,846 in outstanding principal amount, respectively.  The Citic Bank Facilities are guaranteed by PAIH and is secured by a lien on the Qingdao Factory.

92.    **China Minsheng Working Capital Loan.**  Working capital facilities of approximately $29,230,769 in outstanding principal amount (the "**China Minsheng Loan**").  The borrower under the China Minsheng Loan is Pacific Andes Food PRC.  The China Minsheng Loan is guaranteed by PAIH, and is also secured by a lien on the Qingdao Factory.

93.    **Huaxia Bank Facilities.**    Working capital facilities of approximately $16,706,923 in outstanding principal amount (the "**Huaxia Bank Facilities**").  The borrower under the Huaxia Bank Facilities is Pacific Andes Food PRC.  The Huaxia Bank Facilities are guaranteed by PAIH, and are secured by a lien on directors' quarters located in Qingdao in China.

94.    **Taipei Fubon Term Loan.**  An unsecured facility in the principal amount of up to $72,000,000 of which the entire amount remains outstanding (the "**Taipei Fubon Term Loan**") made available pursuant to a term loan facility agreement entered into on May 22, 2015 between Entie Commercial Bank Co., Ltd., Taishin International Bank, Taiwan Shin Kong Commercial Bank, First Commercial Bank, Ltd, Taiwan Cooperative Bank, Bank of

25

Panshin, Chang Hwa Commercial Bank, Chailease International Financial Services Co., Ltd., as lenders, and Taipei Fubon Commercial Bank Co., Ltd., as agent and lender. The borrower under the Taipei Fubon Term Loan is Pacific Andes Food (Hong Kong) Company Limited, and the joint and several guarantors include, *inter alia*, Super Investment.

95.     **Senior Notes.** $300,000,000 9.75% senior notes due 2019 issued by CFG Investment and guaranteed by, *inter alia*, the CF Group Debtors (the "**Senior Notes**") pursuant to that certain indenture dated July 30, 2012 (as amended and supplemented from time to time, the "**Note Indenture**") between CFG Investment (as issuer), certain subsidiary guarantors and TMF Trustee Limited (successor to Citicorp International Limited as of January 6, 2016) in its capacity as trustee (the "**Note Trustee**"). An interest payment was due on the Senior Notes on January 30, 2016. Due to the financial condition of the Debtors, this payment was not made. The Note Indenture is governed by New York law. The CF Group has been engaged in restructuring discussions with an *ad hoc* committee of holders purportedly representing holders owning approximately 26% of the Senior Notes since December 2015 and other holders of Senior Notes (who do not form part of the *ad hoc* committee) owning approximately 20% of the Senior Notes.

96.     **The Club Facilities.** An unsecured facility in the principal amount of up to $650,000,000, of which approximately $418,182,000 in aggregate principal amount is outstanding (the "**Club Facilities**"). The borrowers under the Club Facilities are CFG Investment, Copeinca and CFIL, and the joint and several guarantors include, *inter alia*, CFG Investment, Copeinca, CFIL and CFGL pursuant to a facility agreement dated March 20, 2014 with Rabobank International, Hong Kong Branch ("**Rabobank Hong Kong**"), DBS Bank (Hong Kong) Limited, HSBC, Standard Chartered Bank (Hong Kong) Limited and China CITIC Bank International Limited, as lenders, and Rabobank Hong Kong, as agent (the "**Club Loan Agreement**").

97.    **Bank of America Facility.** Unsecured trade facilities of up to $35,000,000 of which approximately $27,885,961 in principal amount is outstanding (the "**BOA Facilities**"). The joint and several borrowers under the BOA Facilities are CFIL and SPSA, and the guarantor is CFGL pursuant to a facility letter with Bank of America, N.A. dated August 26, 2014.

98.    **Standard Chartered Facility.**    Unsecured trade facilities of up to $11,000,000, of which approximately $1,478,224 in principal amount is outstanding (the "**SCB Trade Facilities**").    The Borrowers under the SCB Trade Facilities are Champion Maritime and Growing Management, and the guarantor is CFGL pursuant to a facility letter dated March 26, 2015.

### III.    ISSUES LEADING TO COMMENCEMENT OF CHAPTER 11 CASES

#### A. Overview

99.    The CF Group's financial condition has deteriorated over the past 30 months largely because of the effects on the anchovy fishery of El Niño which dominated the weather pattern from 2014 through early 2016.[5]    In addition, during this same period, the CF Group experienced the termination of long term supply agreements.    As a result of these events, the CF Group found itself in a tight liquidity position.

---

[5]    "During El Nino, upwelling brings up warm water with few nutrients. A serious economic consequence of El Niño is its devastating effect on the Peruvian anchovy fisheries. Populations of fish and seabirds vanish an anchovy catches the dwindle during El Niño. http://oceanworld.tamu.edu/students/fisheries/fisheries2.htm; "The Peruvian anchovy fishery, which is the biggest single-species fishery in the world, typically collapses during El Niño events." August 14, 2015, http://www.nereusprogram.org/ask-an-expert-how-will-this-years-el-nino-affect-oceans-and-fisheries/;    A report regarding the effects of El Nino from April 1, 2014, stated that "[t]he weather phenomenon will particularly hit the anchovy stock and as a result the fishmeal industry . . ." https://www.undercurrentnews.com/2014/04/01/perus-anchovy-fishmeal-sector-set-for-strong-el-nino-effect-in-2014-expert-says.

B. **The LSA Payment Default**

100.    In April 2014, as a result of the termination of certain long term supply

agreements (the "LSAs") between one of the Debtors, CFIL, and Alatir Limited and/or Perun

Limited, the Debtors found themselves facing a default under the Club Facilities[6] relating to a

requirement that certain funds be deposited by counterparties to the LSAs into a specified

account upon the termination of the relevant LSAs.  The counterparties to the LSAs (Alatir

Limited and Perun Limited) conveyed to CFIL that they had their bank accounts frozen due

to circumstances unrelated to the Debtors, and as a result, failed to make the required

payments in the designated accounts as specified under the Club Facilities.

101.    After engaging in discussions with the lenders, and agreeing to amend the

Club Facilities[7], on April 30, 2014, the lenders granted an extension of the time required to

make these deposits to May 21, 2014.

102.    Through a series of additional waivers and amendments to the Club Loan

Agreement, dated May 22, 2014, September 15, 2014, November 10, 2014, April 15, 2015,

September 30, 2015, October 19, 2015, and November 11, 2015, respectively, the Club

Obligors, among other things, agreed to provide information, retain financial advisors on the

lenders' behalf, and to deliver copious amounts of information.  In addition, a number of

members of the Debtors' management team agreed to personally guaranty certain obligations

under the Club Facility in an amount up to $241,645,185.72.  HSBC and the Debtors also

agreed that certain funds which were expected to be received under the LSAs and were

---

[6]    The borrowers under the Club Facilities at this time were CFG Investment, CFIL and Copeinca (collectively CFG Investment, CFIL and Copeinca are the "Club Borrowers" and collectively with CFGL, the "Club Obligors").  In addition, CFGL is a guarantor of the Club Facilities.  Since this time, one additional Debtor (NS Hong) has become a guarantor of the Club Facility in an amount of up to $241,645,185.72.

[7]    Under the first amendment to the Club Facilities, the Club Obligors agreed "(b) Each of the Club Borrowers and CFIL must procure the Cash LSA Termination Repayment in an aggregate amount not less than $80,000,000 on or before 21 May 2014."

required to be deposited into certain designated accounts under the Club Facilities would be used to repay certain obligations due under the senior notes due 2017 in an aggregate principal amount of $ 250,000,000 issued by Copeinca on February 10, 2010 and January 10, 2013 (collectively, the "**CPI Notes**"). In exchange for the foregoing, the Club Lenders continued to waive defaults and extended the date for performance to November 15, 2015. As of the date of hereof, the refunds received under the terms of the LSAs amount to $210,871,000.

### C. The Period Before Chapter 11

103.    However, identifying the technical defaults does not tell the full story. Prior to April 2014, HSBC and Pacific Andes, including the Debtors, had a strong partnership. Entering 2014, the Debtors' primary banking relationship was with HSBC. Indeed, as times grew tougher for the Debtors, from March 2014 to November 2014, HSBC increased its funding of the Pacific Andes Group from $82,158,000 to $102,177,000 (excluding its exposure under the Club Facilities). In September or October of 2014, this relationship began to show signs of stress. At that time, counsel to HSBC instructed FTI to begin examining certain activities of the Debtors' businesses without any notice to the Debtors. FTI issued a report on October 20, 2014 (the "**FTI Report**") to HSBC. While the report failed to identify any wrongdoing on the part of the Debtors, immediately following the issuance of the report, HSBC convened numerous meetings and calls, all without explanation or any discussion as to the basis of such calls or the contents of the FTI report. At these meetings, HSBC told Pacific Andes that it did not believe it could support the debt that it then had outstanding and, among other things, demanded that such obligations be immediately repaid. As a result of HSBC's requests, by December 31, 2014, the Debtors paid off $102,177,000 of debt leaving only $96,503,494 in outstanding principal owing to HSBC under the Club Facilities.

104. Notwithstanding the significant and rapid repayment of debt, HSBC led the charge to force the Debtors to pay off the Club Facilities in full. During the last four months of 2014, the Debtors and HSBC averaged two calls or meetings per month. During this period, HSBC demanded voluminous amounts of information regarding the Debtors' businesses. In particular, HSBC focused on the long term supply agreements which had been an integral part of the Debtors' business for more than 12 years.

105. At the end of 2014, the CF Group and HSBC continued their discussions regarding the LSA Payments with a renewed focus on the repayment of the CPI Notes, which had been issued by Copeinca prior to the acquisition of it by the CF Group. In order to make certain payments, including payments due under the CPI Notes, in November 2014, a string of rights offerings began. First, PAIH, one of the Debtors in these cases, issued a rights offering which raised HK$410.4MM (or approximately $52,826,014). Of this amount, HK$234,900,834 was contributed by NS Hong, the ultimate parent of the CF Group and one of the Debtors in these cases. These funds were primarily used to fund PARD's rights offering described below.

106. In a further effort to raise funds to repay the CPI Notes, (which formed part of the conditions to the waiver and amendments of the Club Loan), in January 2015, PARD, an indirect parent and another affiliate of the Debtors that is contemplated to file for a Chapter 15 proceeding before this Court and a proceeding before the High Court of the Republic of Singapore, also completed a rights offering raising S$195.5 million (or approximately $150 million). A significant amount of these funds were raised through contributions from PAIH. These funds were used to fund the CFGL rights offering described below.

107. Notwithstanding their ongoing struggles, in April 2015 CFGL completed a rights offering in the amount of S$282.5 million (or approximately $209.8 million).

Approximately S$237.1 million of the S$282.5 million raised by CFGL was used to redeem the CPI Notes.

108.    In February 2015, in the midst of the rights offerings, as the Debtors continued to focus on the redemption of the CPI Notes, the Debtors received word that the Damanzaihao and related fishing vessels had been suspended from fishing.    The Damanzaihao is the largest factory fishing vessel in the world capable of processing 200 metric tons of fish per day.

109.    On March 12, 2015, CFGL made a $100 million payment on the Club Facilities.  On June 25, 2015, an additional $31.8 million was repaid under the Club Facilities.

110.    On August 18, 2015, the Securities and Futures Commission of Hong Kong (SFC) served PAIH with two notices to produce records and documents in connection with an investigation that it was conducting.  On the same day, PARD and CFGL also received at their respective offices in Singapore, notices from the Secondary Markets Conduct and Enforcement Division, the Market Conduct Department, the Monetary Authority of Singapore (MAS) and the Commercial Affairs Department (CAD), informing PARD and CFGL that the MAS and CAD were conducting an investigation pursuant to the Securities and Futures Act of Singapore (Cap. 289), compelling the production of documents and electronic data with respect to certain third parties, one of whom was a trading counterparty of the Pacific Andes Group.

111.    While discussions continued among HSBC and the CF Group, the CF Group's situation continued to deteriorate.  On August 19, 2015, the Hong Kong and Singapore Stock Exchanges suspended the trading of shares of PAIH, PARD and CFGL, respectively.

112.    In September 2015, (i) HSBC requested at meetings held with the Pacific Andes bank creditor group, that the other banks who were party to the Club Facilities buy out

31

HSBC's position, and (ii) PAIH and PARD retained Deloitte & Touche Financial Advisory Services, Hong Kong ("**Deloitte**") to act as financial advisors to assist them in connection with a possible restructuring of the Club Facilities. From the time of its retention through November 2015, Deloitte, at the direction of the CF Group, had provided weekly updates to the Club Lenders along with weekly rolling cash forecasts.

113.    While the Pacific Andes Group's initial goal was to maintain their businesses while finding sufficient cash to pay off their obligations, by September of 2015, it had become evident that they might need to take drastic steps to preserve as much of the Pacific Andes Group as possible. Accordingly, it was contemplated that some or all of the CF Group would be sold (the "**Initial Proposed Divestment**"). At the time, an estimated market value of $1.6 to $1.7 billion had been placed on the CF Group by Deloitte. Had a sale been consummated in this range, the Initial Proposed Divestment would have allowed all creditors of Pacific Andes to be paid in full.

114.    Unfortunately, on November 25, 2015, all negotiations were derailed by the *ex parte* commencement by HSBC of an action in the Hong Kong Court seeking the winding up of CFGL and CFIL and the appointment of JPLs. This action would ultimately be found to be without merit.

115.    Upon receipt of HSBC's application, the Hong Kong Court, in light of the duty of a party to disclose all material facts (and without knowledge of HSBC's flagrant breach of this duty), granted on an interim basis appointment of three joint provisional liquidators. In addition, HSBC filed a subsequent action based on the findings and rulings of the Hong Kong Court in the Cayman Court (as hereinafter defined). The individuals appointed, Edward Simon Middleton, Fergal Thomas Power and Kris Beighton (collectively, the "**JPLs**"), were the KPMG partners who were serving as financial advisors to the Club Lenders in respect of the CF Group restructuring.

32

116.    The JPLs ignored the conflicts of interest that existed under applicable law as a result of KPMG's role as financial advisor to the Club Lenders which, at the time of their appointment, had not yet been terminated. They also neglected to disclose this dual role to the Hong Kong Court. KPMG only informed CFGL of its involvement in the *ex parte* proceeding after the JPLs were appointed as provisional liquidators over CFGL and CFIL. In addition, KPMG serves as auditors to certain other companies in the Pacific Andes Group, which KPMG also neglected to disclose to the Hong Kong Court.

117.    At the time that the JPLs were appointed, two investment groups were at advanced stages of negotiations regarding acquiring some or all of the CF Group. A creditor meeting had been scheduled where PAIH management and Deloitte intended to present all creditors with, among other things, the status of the Initial Proposed Divestment. Due to the appointment of the JPLs and the ensuing confusion, the meeting was cancelled, negotiations broke down, and neither of these transactions was ever consummated.

118.    Under the laws of Hong Kong, while the right to present a winding up petition on the basis of an unpaid debt is a right of any creditor, the appointment of a provisional liquidator may only be made if there is a risk of dissipation of the assets of the company in question. HSBC's application was based on transactions involving PAIH and PARD.[8] These allegedly suspicious transactions had nothing to do with CFGL or the other Debtors.

---

[8]    The Debtors and their affiliates submit that there was nothing improper in respect of the transactions raised by HSBC. By way of background, these transactions involved fishing operations located in Russia [having nothing to do with the Debtors]. The facts which HSBC claimed supported their allegations of impropriety were based on a report prepared by FTI Consulting Hong Kong (the "FTI Report") which were, in turn, based on outdated and limited information that was at least 18 months old, and was not verified or discussed with the management of PAIH, PARD or the CF Group. The only information the FTI Report utilized was provided by HSBC or was otherwise publicly available. HSBC had also not informed FTI that it had intended to use the FTI Report for the purposes of its application and FTI had not prepared the FTI Report for such purpose. Indeed, the FTI Report expressly stated that FTI had not arrived at any conclusion. The FTI Report was delivered to HSBC more than 12 months before HSBC made the application for the appointment of joint provisional liquidators. If these facts indeed justified the urgent appointment of joint provisional liquidators over CFGL and CFIL to prevent the dissipation of assets for the benefit of creditors, it would have necessitated the immediate appointment of provisional liquidators in 2014, and not a year after the FTI Report had been provided to HSBC. Indeed, during the one year period when HSBC had the benefit of the FTI Report, HSBC had reduced its

33

119.    Ultimately, the Hong Kong Court discharged and terminated the JPLs on January 5, 2016, vindicating the CF Group from any wrongdoing, finding that the JPLs should not have been appointed over CFGL and CFIL to begin with.

120.    Although the JPLs were discharged and terminated by an order of the Hong Kong Court, and while it is unlikely they would have ever been appointed by the Cayman Court had HSBC not first obtained the decision appointing the JPLs from the Hong Kong Court, HSBC insisted on proceeding with the winding up petition in the Grand Court of the Cayman Islands (the "**Cayman Court**"). After extensive negotiations that resulted in a Deed of Undertaking dated January 20, 2016 (the "**Deed**"), which, among other things, required that the CF Group be sold by July 15, 2016, HSBC agreed to withdraw the winding up petition in Hong Kong and the Cayman Islands.

121.    Notwithstanding the agreement to discharge and terminate the JPLs, the JPLs refused to step down and relinquish control of CFGL and CFIL until all of their fees were paid, despite the fact that these fees had not yet been reviewed by the Hong Kong Court pursuant to normal practice.  Moreover, these fees had not been reviewed by the Debtors, their affiliates or the Cayman Court.  The JPLs' demands for fees were contrary to the standard practice of the Courts in Hong Kong and the Cayman Islands in respect of the payment of fees of any court appointed officer.  Furthermore, the refusal of the JPLs to step down, notwithstanding the order of the Hong Kong Court that terminated and discharged their appointment, is unprecedented.

---

financial indebtedness exposure to the Pacific Andes Group and, at the time when it applied for the appointment of the joint provisional liquidators, HSBC only had exposure to the CF Group (and not the other members of the Pacific Andes Group).  These circumstances, coupled with the fact that HSBC had not consulted with any other creditor before making the application for the appointment of the joint provisional liquidators, gave the CF Group serious cause for concern that HSBC had ulterior motives in seeking the appointment of joint provisional liquidators.

122.    The termination and discharge of the JPLs was a significant and important milestone for the Debtors and their affiliates, and the CF Group hoped that the discharge of the JPLs would allow the fishmeal operations to resume and move forward with its prior vigor. However, the damage caused by the appointment and actions of the JPLs during the 2-months in which they were in office has proven to be irreparable. Specifically, the actions taken by the JPLs during their tenure, including their allegations of impropriety by the management of the CF Group to the Peruvian banks, meeting with the banks, suppliers and creditors and statements to the press and others, have resulted in (a) the continued refusal by the Peruvian banks to restore the Inventory Financing needed by the CF Group to resume normal operations and (b) the unwillingness of suppliers and trade counterparties (such as suppliers, vendors and customers) to deal with the CF Group and in particular, CFG Peru.

### D.  Irreparable Damage Caused by the Joint Provisional Liquidators to the Business and Operations.

123.    The success and viability of the CF Group's business is dependent on it being able to harvest fish up to its Peruvian fishing quotas. The CF Group's management team has a proven track record of successfully managing its assets in a manner that maximizes the revenue realized on the CF Group's quota. But, to do so, they require (a) liquidity, (b) the cooperation of local vendors, including warehousemen, and (c) experienced local fishermen and workers. The actions of the JPLs has raised concern and anxiety among the local communities and banks about, and called into question, the long term viability of the CF Group and, in particular, its Peruvian operations. For example, upon learning of the appointment of the JPLs, BBVA and Scotia Bank suspended all financing, and BCP reduced the amount of available financing from $100 million to $8 million. Consequently, a tight liquidity position became a liquidity crisis, thereby threatening the Debtors' very ability to survive.

35

124.    The beginning of the fishing season is the low point in CFG Peru's cash cycle. The Debtors rely on Inventory Financing to fund expenses through the season as the period from the time fish is harvested to the time payment is received on fishmeal and fish oil can be anywhere from a few weeks to several months. The fishing season began on November 17, 2015. On November 25, 2015, the JPLs were appointed. Without funding, the CF Group had no alternative other than to suspend operations in December 2015. The CF Group estimates that it would have realized revenues of $127 million had it proceeded with the season. Instead, because of the appointment of the JPLs, the CF Group realized revenue of only $108 million (without deducting for additional taxes that had to be paid as a result of selling fishmeal locally instead of exporting it). Thus, the appointment of the JPLs caused a loss of approximately $19 million from November 2015 to March 2016, plus potential future losses that may be suffered as the Debtors struggle to repair the damage caused by the JPLs' reckless actions.

125.    The damage to the CF Group was further exacerbated when the JPLs, together with their Hong Kong legal counsel, went to Peru to meet with local suppliers, customers, workers, and each of the Peruvian banks. The JPLs took these actions under the auspices that they were so empowered under the orders of the Hong Kong and Cayman Courts. However, the JPLs' actions were in no way authorized or approved under any applicable law or any Court order. Neither of the orders had or purported to have worldwide effect or, for that matter, any effect in Peru. The JPLs never sought recognition of the orders in Peru. The JPLs were never appointed in any respect or regard or held any authority over any entity organized under the laws of Peru as Copeinca and CFG Investment. Moreover, it is my understanding that, without any basis in fact or law, the JPLs claimed that the CF Group's management engaged in illegal and improper conduct. After the visit of the JPLs, warehouse companies were no longer willing to do business with the CF Group. Warehouse companies

36

are an essential element of the CF Group's finance system (given that they have custody of the fishmeal which is security for the Inventory Financing). The loss of warehouse facilities meant that the CF Group's operations were shut down and its flow of revenue was terminated.

126.    The second fishing season of 2015 ended on January 31, 2016. Given the discharge and termination of the provisional liquidators in January 2016, the CF Group, and in particular, CFG Peru, was hopeful that it could restore the confidence of the Peruvian banks and local vendors before the south Peruvian fishing season began in June 2016. However, the damage that resulted from the JPLs actions was irreparable. From January 2016 through May 2016, the CF Group's management met and negotiated with the local Peruvian banks in an attempt to reinstate the Inventory Financing; these efforts proved futile.

127.    Additional factors also contributed to a deepening of the Debtors' financial crisis. On January 30, 2016, the CF Group failed to make an interest payment in the amount of $14,625,000 on the Senior Notes and in February 2016, affiliates of the Debtors were forced to use $3.1 million of their limited cash to pay certain undocumented, unsupported and unsubstantiated fees of the JPLs in contravention of applicable laws, rules and practice.[9]

128.    After the dismissal of the JPLs, the CF Group was hopeful that it would be able to resume normal operations in Peru. This return to normal operations required the support of its stakeholders, in particular its local working capital providers. However, in light of the JPL's flagrant interference with the business of CFG Peru, including the unauthorized meetings with local suppliers and working capital providers, these local stakeholders were wary of, and unwilling to deal with, CFG Peru and reinstate the prior arrangements. This was

---

[9]    The provisional liquidators have not made any attempts to provide details in relation to these fees. A court application is in the process of being made by China Fishery Group Limited with respect to the review and taxation of these fees, but this process is likely to take a considerable amount of time.

extremely challenging for the CF Group's operations since the inability to obtain working capital would undoubtedly detrimentally impact the revenues of the CF Group for 2016.

129.    Due to tireless efforts of the management of CFG Peru, the local working capital providers were prepared to consider providing a new round of working capital facilities if supported, in part, by the CF Group's offshore banks.  Mr. Paul Brough, the chief restructuring officer of the CF Group who was appointed pursuant to the Deed at the specific request of HSBC, with the support of the other banks who advanced the Club Facilities (the "**Other Club Banks**"), approached the Other Club Banks to request that a minimal amount of working capital be advanced to the CF Group to enable it to resume its operations in Peru.  After extensive negotiations including countless hours spent addressing the objections raised by certain holders of Senior Notes and HSBC with respect to the incurrence of these working capital facilities, a facility letter for the provision of up to $25,500,000 was entered into between Copeinca (as borrower) and the Other Club Banks (the "**Initial Working Capital Facilities**").  The Initial Working Capital Facilities were guaranteed by each of CFGL, CFG Peru Singapore and NS Hong.  Of these Initial Working Capital Facilities, Copeinca only drew down $5 million before the CF Group ran into further difficulties with the Other Club Banks.  The most significant was the demand by the Other Club Banks that the CF Group enter into certain "governance agreements" which purported to restrain and regulate the discretion of the CF Group, most importantly, restricting the CF Group's ability to dispose of any assets.  Such a restriction would impede CFG Peru's ability to carry out its business in the ordinary course.  Unfortunately, negotiations between the CF Group and the Other Club Banks surrounding these governance agreements and the level of protection required to provide the Club Banks comfort, resulted in the Other Club Banks taking an even more draconian stance, proposing that the CF Group enter into an agreement that would allow the Club Lenders to remove local management of the Peruvian subsidiaries.  The local

38

management team of CFG Peru is the only constant in the Peruvian business, and is the main reason why certain local stakeholders of CFG Peru are still willing to deal with the CF Group. The proposal by the Other Club Banks that local management be replaced by accountants who lack experience, skills, ability or competence could not be accepted by the CF Group.  In light of the CF Group's inability to resolve these issues with the Other Club Banks, and the ongoing threats with respect to potential enforcement action as a result of the CF Group's refusal to execute the governance agreements, on June 8, 2016, the CF Group used its limited cash resources that were obtained from tax refunds to fully repay the amounts drawn under the Initial Working Capital Facilities, and thus, temporarily staved off these threats of enforcement.

130.    The seeming progress that had been made by the CF Group in obtaining the Initial Working Capital Facilities appears to have vanished.  The hope of obtaining further working capital support to fund the North fishing season from the Other Club Banks appears a distant and remote possibility.  At the same time, CFG Peru was continuing to face increased strains in satisfying its daily working capital needs including the payment of suppliers, service providers, employees and other vendors.  While the management of CFGL continues its dialogue with the Other Club Banks in an effort to obtain further working capital, it appears highly unlikely that CFG Peru can continue to rely on CFGL's efforts in this regard.

131.    In addition, Grant Thornton, the monitoring accountant appointed under the terms of the Deed threatened to resign unless its fees were paid.  Such an action would result in a breach of the Deed and entitle HSBC and/or Bank of America to apply for the reappointment of the joint provisional liquidators over CFGL and CFIL.  Grant Thorton's demand for $1,200,000 to be paid immediately has exerted further pressure on the CF Group and only worsens an already dire financial situation.  Notwithstanding its limited cash

resources, the CF Group made a partial payment of $250,000 to Grant Thornton on June 17, 2016 but continues to face immense pressure from Grant Thornton for further payments and continued threats of resignation.

132.    The failure of a numerous direct and indirect subsidiaries to be able to make payments to lenders and vendors has led to letters of demand and statutory demands being served on PAIH in its capacity as an alleged guarantor.   In addition, as a result of the insolvency of the Pickenpack Germany Group, the insolvency administrator of Pickenpack Holding Germany GmbH has also served letters of demand on PAIH expressing their intention to make a claim on PAIH under certain letters of comfort issued by PAIH in favor of the Pickenpack Germany Group.  While PAIH continues to contest the validity of these claims, the numerous claims and demands being made on PAIH by various stakeholders require ever increasing amount of management's time and resources thus distracting management from focusing on resuscitating the business and restoring stability and confidence in the Pacific Andes Group.  In addition to the numerous claims, PAIH now faces the threat of being forced to defend numerous claims in a multitude of forums around the globe.  The cost in terms of time and money required to defend such actions, could cause or substantially contribute to the failure of the Pacific Andes Group.

133.    The events discussed above along with the ongoing threat and prosecution of actions around the globe have led to the Debtors commencing these Chapter 11 Cases.

E.  **Adverse Impact on the Sale Process.**

134.    The appointment of the JPLs severely impacted negotiations with potential buyers and investors.  The uncertainty caused by the appointment of the JPLs, and the suspension of operations, unsettled buyers and investors.  Moreover, a forced deadline of

July 15, 2016 by which a sale must be completed has led many potential buyers to take a "wait and see" attitude in hopes that there might be a fire sale.

135.    In accordance with the Deed, the CF Group has continued to cooperate and to pursue the sale of the CF Group or its assets. However, in light of the cessation of operations, the lack of ability to obtain financing for the North fishing season, the weather phenomenon El Niño which has continued to affect fishing in Peruvian water, current economic conditions in China, Europe and elsewhere, it appears that during the time period subsequent to the execution of the Deed, the environment in which the CF Group or its assets could be sold at a value anywhere near their actual value of $1.7 to $1.8 billion, has greatly deteriorated.

136.    Notwithstanding the challenging circumstances faced by the CF Group, it continued its tireless efforts to pursue the sale. Between May 31, 2016 to June 2, 2016, the CF Group received non-binding expressions of interest from 7 potential purchasers of the Peruvian business.

137.    Given the delays in timing with respect to the sale process and in light of the extensive resources in terms of time and resources that the management of CF Group had to devote to obtaining financing for the South fishing season, it was not possible for a sale to be completed by July 15, 2016. When this became evident, CFGL attempted to and was hopeful that it would be able to obtain an extension of the July 15, 2016 deadline under the Deed from HSBC in light of the progress and strong expressions of interest that occurred during the sale process. However, HSBC initially responded negatively to this overture for an extension of this deadline and informed CFGL that CFGL's suggestion with respect to its inability to consummate the sale of the Peruvian business of the CF Group by July 15, 2016 constituted a breach under the Deed, the terms of which HSBC fully intended to enforce. While HSBC has since indicated on a non-committal basis that it would be prepared to consider a request for an extension, which would be conditional upon further demands, CFGL has not received any

41

commitment from HSBC. HSBC's initial response to CFGL's overtures was disappointing and extremely worrying since there was real value for stakeholders (including shareholders) in the Peruvian business. The response was even more disappointing given that the overture from CFGL was made by the chief restructuring officer who was appointed at the specific request of HSBC notwithstanding his expressions of and confidence in the sale process, as evidenced by the numerous offers and expressions of interest that had been received by the CF Group. Any re-appointment of the JPLs would likely result in any potential sale of the Peruvian assets being sold at a fire sale price.

138.    The management of CFG Peru was also concerned about HSBC's negative reaction to the request for an extension of the deadline for another reason. While the news had not yet been made public, management was concerned that stakeholders would cease dealing with CFG Peru, destroying the incremental progress that had been made over the past months, and that local creditors would hasten to take enforcement action against CFG Peru if there was a high likelihood that the JPLs would be reappointed. In addition, Bank of America, N.A. has also threatened to enforce the terms of the Deed (including making an application for the re-appointment of JPLs) if the BOA Facilities would not be discharged in full by the July 15, 2016 deadline.

139.    To make matters worse, the Other Club Banks who had previously expressed their desire and intention to support the CF Group in the context of the sale process are now making demands to which the CF Group cannot accede, such as a requirement that the lenders be consulted as to the form of the sale and purchase agreement related to the sale of the CF Group. This requirement to be fully consulted will inevitably result in the sale process being at least delayed (and potentially derailed), and is simply not feasible given the July 15, 2016 deadline imposed under the Deed. The CF Group is therefore put in a position of immense difficulty given the different demands of different creditors. In addition, the Other

Club Banks have continued their demands for governance agreements which could force the Debtors management and officers to choose between breaching the agreement or breaching their fiduciary duties to be executed. Such demands are more outrageous since the execution of such agreements were conditions to the continued provision of the Initial Working Capital Facilities. However, the Initial Working Capital Facilities have been paid in full.

140.    In the days leading up to the commencement of these cases, an involuntary liquidation of the CF Group and a forced sale of the Peruvian business appeared to be much more imminent in light of the threats of enforcement by HSBC, Bank of America, N.A. and certain of the Other Club Banks. It is highly possible that any application for the appointment of joint provisional liquidators by any of these creditors would be made on an ex parte basis, without notice to the CF Group or its other stakeholders. If JPLs were re-appointed over CFGL and/or CFIL, it would put the CF Group in a perilous and defenseless position, without any ability to protect the interests of the CF Group and its stakeholders.

141.    The CF Group respectfully submits that a forced sale according to the terms of the Deed would harm a large number of stakeholders of the Pacific Andes Group and the CF Group. In particular, creditors that rely upon the equity value of the CF Group for their recovery would be irreparably harmed if HSBC, Bank of America or any of the Other Club Banks were permitted to force a fire sale. In order to maximize the value realized by all stakeholders, operations should be restarted and normalized, a feasible capital structure should be put in place under which all creditors of the CF Group are paid in full, the CF Group can streamline its operations and dispose of non-essential assets, all of which could be implemented through these cases, cases pending in other courts and a plan of reorganization. In the recent past, the CF Group was successful and profitable, and we expect that more favorable conditions will allow it to be so again. Notably, experts believe that the harvest of anchovy in the coming months is likely to be significantly better than last year and climate

conditions are moderating.   If the CF Group is allowed to normalize operations and restructure its finances and operations through the implementation of a Plan of Reorganization proposed by the Debtors, it will be able to capitalize on these favorable conditions and once again be profitable.

142.    The filing of these cases is proper before this Court as the Debtors have property located in this judicial district.  In particular, the Debtors have deposited property in the form of retainers with Meyer Suozzi English Klein P.C., RSR Consulting, LLC, and Goldin Associates, LLC.  With respect to the choice of the United States Bankruptcy Code and a filing in the Southern District of New York, I have discussed with the Debtors and their legal advisors the various options available to the Debtors for reorganization under the laws of various jurisdictions in which the Debtors operate or have property.  Certain Debtors conduct business in United States Dollars, have debt denominated in United States Dollars held by international lenders that have operations in New York, and are subject to jurisdiction in the United States.  The Note Indenture is governed by New York law and, under the provisions therein, the obligors (both issuers and guarantors) have consented only to the jurisdiction and venue in the state and federal court located in the City of New York. Weighing the available options, the Debtors have determined in good faith that this Court in the United States is the jurisdiction in which the reorganization of the Debtors is most feasible and proper in order to maximize the recovery to and protect the interests of their creditors, employees, current customers and other stakeholders.

## F.  <u>**Restructuring Process For CFG Peru**</u>

143.    In light of the immense and long standing financial difficulties and ongoing threats that were faced by or made against CFG Peru and the CF Group, especially with respect to its Peruvian business, the CF Group concluded that it was necessary to protect the Peruvian business of the CF Group.

144.    On June 30, 2016, ordinary insolvency proceedings (the "**Peruvian Restructuring Proceedings**") were commenced in respect of each of CFG Investment, Copeinca and Sustainable Fishing Resources (the "**Peruvian Filing Entities**") by way of an involuntary petition since the Peruvian Filing Entities were unable to satisfy the technical requirements of being able to submit audited financial statements for the fiscal period ending April 30, 2016.  Shortly after the commencement of the Peruvian Restructuring Proceedings, given the integral nature of the Peruvian Filing Entities to the Pacific Andes Group and the CF Group, each of the Peruvian Filing Entities filed a petition under Chapter 15 of the Bankruptcy Code seeking recognition of the Peruvian Restructuring Proceedings by this Court.

145.    Given that the Peruvian operations are an integral part of the Pacific Andes Group and the CF Group and key source of revenues, I believe that any plan of reorganization to be proposed by the Debtors will inevitably be inextricably interwoven with the terms of the restructuring plan negotiated in the Peruvian Restructuring Proceedings.

### III.    THE DEBTORS' CHAPTER 11 CASES

146.    The Debtors intend to operate their business in the ordinary course during these Chapter 11 Cases.  I have reviewed the Debtors' projected financial information which is primarily based on forecasted financial information of CFG Peru.  Based on the forecasts prepared by the management of CFG Peru, it is anticipated that post-petition revenue from operations will exceed $33 million per month from June 2016 to September 2016 and $44 million per month from December 2016 to February 2017.

147.    As noted above, a number of the direct or indirect subsidiaries of certain of the Debtors are the subject of the Peruvian Restructuring Proceedings.  These entities generate a substantial portion of the Debtors' revenue.    In light of the Peruvian Restructuring

Proceedings, it is unclear how much cash will be available to the Debtors during the pendency of these cases.

## IV.    THE DEBTORS' FIRST DAY MOTIONS

148.    The Debtors are seeking only limited relief in their First-Day Motions. However, receiving this Court's approval of the relief sought in the First-Day Motions is essential to transitioning the Debtors into Chapter 11 which will provide the Debtors an opportunity to work towards a successful restructuring that will benefit all of the Debtors' constituents and stakeholders.

### i.    *Motion for an Order Authorizing Joint Administration of the Debtors' Chapter 11 Cases*

149.    The Debtors are "affiliates" as defined in section 101(2) of the Bankruptcy Code. The Debtors therefore request that the Court jointly administer the Chapter 11 Cases. Joint administration will obviate the need for duplicative notices, motions, applications and orders, thereby saving considerable time for the Court and time and expense for the Debtors and their estates. I believe that joint administration will promote the fair and efficient administration of the Chapter 11 Cases, and accordingly, respectfully submit that this motion should be approved.

### ii.    *Motion for an Order Extending the Time to File Schedules and Statements*

150.    The Debtors have requested that the Court extend the fourteen (14)-day period to file their schedules of assets and liabilities, schedules of current income and expenditures and schedules of executory contracts and unexpired leases (collectively, the "**Schedules**") and statements of financial affairs (the "**Statements**") for an additional forty-five (45) days, for a total of fifty-nine (59) days.

46

151.    The size and complexity of the Debtors' businesses, the large number of entities and the volume of material that must be compiled and reviewed by the Debtors' staff to complete the Schedules and Statements for each Debtor during the initial days of the Chapter 11 Cases provide ample "cause" to justify and support the requested extension. In addition, given that the fate of the CF Group is heavily reliant and dependent on the Peruvian Restructuring Process (which has just been commenced), local employees and management in Peru, and that many books and records are maintained in Spanish, additional time is required to provide the requisite information in the form required.

152.    An extension will permit the Debtors and their advisors to gather the necessary information in a manner that maximizes accuracy and avoids the necessity of subsequent corrections and amendments. All parties will benefit from the enhanced accuracy of the information-gathering process. Additionally, the Debtors do not intend to sell or otherwise dispose of their assets (other than products which are sold in the ordinary course of the Debtors' business) during this 59-day period, so no party-in-interest will suffer any adverse consequences as a result of the Debtors' requested extension. Accordingly, I respectfully submit that this motion is in the best interest of the Debtors and their estates and should be approved.

### iii.    *Motion for an Order Enforcing Sections 362, 365(e)(1) and 525 of Bankruptcy Code*

153.    The Debtors have requested that the Court enter an order enforcing and restating the automatic stay, *ipso facto* and anti-discrimination provisions under sections 362, 365(e)(1) and 525 of the Bankruptcy Code. The Debtors are a leading international fishing company which serves customers worldwide. As a result, the Debtors have many foreign creditors, and other parties-in-interest in various countries who may not be well versed in the protections and restrictions of the Bankruptcy Code. Some of these creditors do not transact

47

business on a regular basis with companies that have filed for chapter 11, or are unfamiliar with the scope of a debtor-in-possession's authority to conduct its business. Such circumstances warrant an order apprising parties—especially non-U.S. customers, creditors and vendors—of sections 362, 365(e)(1) and 525 and the protections provided thereby. Accordingly, I respectfully submit that this motion should be approved.

## V.    INFORMATION REQUIRED BY
## LOCAL BANKRUPTCY RULE 1007-2

154.    Rule 1007-2 requires certain information related to the Debtors, which I have provided in the exhibits. Specifically, these exhibits and the other exhibits contain the following information with respect to the Debtors:

(a)    **Exhibit A** provides an up-to-date corporate structure chart for the Debtors and their affiliates.

(b)    Pursuant to Local Rule 1007-2(a)(3), the name and address of the attorneys for the Ad Hoc Committee of Holders is: Kirkland & Ellis, 26th Floor, Gloucester Tower, The Landmark, 15 Queens Road Central, Hong Kong, Attn: Damien Coles.

(c)    Pursuant to Local Rule 1007-2(a)(4), **Exhibit B** attached hereto provides the following information with respect to each of the holders of the Debtors' 50 largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment, or suite number, and zip code, if not included in the post office address) and telephone number; the name(s) of person(s) familiar with the Debtors' account; the nature and approximate amount of the claim; and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

(d)    Pursuant to Local Rule 1007-2(a)(5), the Debtors represent there are no holders of secured claims.

48

(e)     Pursuant to Local Rule 1007-2(a)(6), **Exhibit C** attached hereto provides a summary of the Debtors' assets and liabilities.

(f)     Pursuant to Local Rule 1007-2(a)(7), the Debtors make the following disclosures regarding their publicly traded securities: PAIH has 7,083,103,027 shares of common stock outstanding, held by approximately 1,695 registered holders; CFGL has 3,683,438,182 shares of common stock outstanding, held by approximately 4,197 registered holders. The Debtors are compiling the information required this rule.

(g)     Pursuant to Local Rule 1007-2(a)(8), the Debtors represent that there is no property in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditors, or agent for such entity.

(h)     Pursuant to Local Rule 1007-2(a)(9), **Exhibit D** attached hereto provides a list of the premises owned, leased or held under other arrangement from which the Debtors operate their business.

(i)     Pursuant to Local Rule 1007-2(a)(10), the Debtors books and records are located at Rooms 3201-10, Hong Kong Plaza, 188 Connaught Road West, Hong Kong. The Debtors major assets that are located outside of the United States are set forth on **Exhibit E** attached hereto.

(j)     Pursuant to Local Rule 1007-2(a)(11), **Exhibit F** attached hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment or seizure of their property may be imminent.

(k)     Pursuant to Local Rule 1007-2(a)(12), **Exhibit G** attached hereto sets forth a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

(l)    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Exhibit H** attached hereto provides the estimated amount of payroll to the Debtors' employees (not including officers, directors and stockholders) and the estimated amounts to be paid to officers, stockholders, directors, and financial and business consultants retained by the Debtors, for the 30-day period following the filing of the Debtors' Chapter 11 Cases.

(m)    Pursuant to Local Rule 1007-2(b)(3), **Exhibit I** attached hereto provides a schedule for the 30-day period following the filing of the Chapter 11 Cases, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

*[**signature page follows**]*

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the

United States of America that the foregoing statements are true and correct to the best of my

knowledge, information and belief.

Executed on June 30 , 2016
in Hong Kong, Special Administrative Region of the People's Republic of China

_____
Ng Puay Yee

EXHIBIT  A



30 June 2016

Legend:
Pacific Andes International Holdings Limited (Bermuda) ("PAIH")
Pacific Andes Resources Development Limited (Bermuda) ("PARD")

EXHIBIT  B

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **CHINA FISHERY GROUP LIMITED (CAYMAN),** *et al.,* | **Case No. _____ ( )** |
| Debtors.[1] | **(Joint Administration Pending)** |

## LIST OF DEBTORS' LARGEST 50 UNSECURED CREDITORS
## ON A CONSOLIDATED BASIS (EXCLUDING INSIDERS)

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| Rabobank Intl, HK<br>32/F, 3 Pacific Place<br>1 Queens Road East<br>Hong Kong | | $96,503,494.62 |
| DBS Bank (HK) Ltd<br>16th Fl, The Center<br>99 Queens Road<br>Central<br>Hong Kong | | $96,503,494.62 |
| HSBC<br>L16, HSBC Main Bldng<br>1 Queen's Road<br>Central<br>Hong Kong | | $96,503,494.62 |

---

[1] The Debtors are China Fishery Group Limited (Cayman) ("CFGL"), Pacific Andes International Holdings Limited (Bermuda) ("PAIH"), N.S. Hong Investment (BVI) Limited ("NS Hong"), South Pacific Shipping Agency Limited (BVI) ("SPSA"), China Fisheries International Limited (Samoa) ("CFIL"), CFGL (Singapore) Private Limited ("CFGLPL"), Chanery Investment Inc. (BVI) ("Chanery"), Champion Maritime Limited (BVI) ("Champion"), Growing Management Limited (BVI) ("Growing Management"), Target Shipping Limited (HK) ("Target Shipping"), Fortress Agents Limited (BVI) ("Fortress"), Ocean Expert International Limited (BVI) ("Ocean Expert"), Protein Trading Limited (Samoa) ("Protein Trading"), CFG Peru Investments Pte. Limited (Singapore) ("CFG Peru Singapore"), Smart Group Limited (Cayman) ("Smart Group"), and Super Investment Limited (Cayman) ("Super Investment").

[2] The Debtors reserve the right to assert that ant of these claims are contingent, unliquidated or disputed.

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Standard Chartered Bnk (HK) Ltd<br>15/F, Stndrd Charter Bnk Bldng<br>4-4A Des Voeux Road<br>Central<br>Hong Kong | | $96,503,494.62 |
| China CITIC Bnk Intl Ltd<br>80th Fl, Intl Commerce Cntr<br>1 Austin West<br>Kowloon<br>Hong Kong | | $32,167,831.54 |
| TMF Trustee Ltd<br>Corporate Trust<br>5th Fl, 6 St. Andrew St<br>London, EC4A 3AE<br>United Kingdom | | $296,000,000.00 |
| Rabobank NFS Finance<br>32/F, 3 Pacific Place<br>1 Queens Road East<br>Hong Kong | | $102,000,000.00 |
| Maybank<br>18/F CITIC Tower<br>1 Tim Mei Avenue<br>Central<br>Hong Kong | | $95,000,000.00 |
| Rabobank<br>Pickenpack Facility Agmnt<br>32/F, Three Pacific Place<br>1 Queens Road East<br>Hong Kong | | $94,375,235.00 |
| Tapei Fubon Com Bk Co Ltd<br>12F 169, Sec 4, Ren Ai Rd<br>Taipei, 106886 | | $72,000,000.00 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| Taiwan | | |
| CITIC<br>61-65 Des Voeux Road<br>Central<br>Hong Kong | | $70,900,000.00 |
| DBS<br>16th Floor, The Center<br>99 Queens Road<br>Central<br>Hong Kong | | $58,000,000.00 |
| Maybank<br>18/F CITIC Tower<br>1 Tim Mei Avenue<br>Central<br>Hong Kong | | $40,000,000.00 |
| Bank of America, N.A.<br>52/F. Cheung Kong Center<br>2 Queen's Road Central<br>Central<br>Hong Kong | | $30,000,000.00 |
| Bank of America<br>52/F, Cheung Kong Center<br>2 Queens Rd Central<br>Central<br>Hong Kong | | $30,000,000.00 |
| Rabobank<br>32/F, 3 Pacific Place<br>1 Queens Road East<br>Hong Kong | | $22,000,000.00 |
| Brndbrg Mrt Invst Hldng<br>L8, Medine Mews<br>La Chaussée<br>Port Louis, Mauritius | | $15,558,581.87 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Andes Int'l Qingdao Ship<br>N67 Yin Chuan Xi Rd, Bl D<br>Qingdao Amintn Ind Pk 4Fl<br>Qingdao City 266000<br>Shandong Province, China | | $13,651,769.99 |
| Rabobank<br>32/F, 3 Pacific Place<br>1 Queens Road East<br>Hong Kong | | $12,000,000.00 |
| Fubon<br>Fubon Bank<br>38 Des Voeux Road<br>Central<br>Hong Kong | | $11,000,000.00 |
| Standard Charter Bank<br>Standard Charter Bank Building<br>5/F 4-4A Des Voeux Rd<br>Central<br>Hong Kong | | $8,000,000.00 |
| DLA PIPER HONG KONG<br>17th Flr, Edinburgh Twr<br>The Landmark<br>15 Queen's Road Central<br>Hong Kong | | $1,789,232.13 |
| Grant Thornton Recovery<br>Level 12, 28 Hennessy Rd<br>Wanchai<br>Hong Kong | | $907,427.24 |
| Brndbrg Nam Invt Co<br>Erf 2347 10th St E<br>Industrial Area<br>PO Box 658 Walvisbay<br>Republic of Namibia | | $783,559.21 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Deloitte Touche Tohmatsu<br>35/F One Pacific Place<br>88 Queensway<br>Hong Kong | | $682,261.03 |
| Baraka Seari Ltd<br>Rm 1401-2<br>Easey Comercial Bldng<br>253-261 Hennessy Rd<br>Wanchai, Hong Kong | | $657,200.00 |
| Meridian Invst Group Pte<br>138 Cecil Street<br>#12-01A Cecil Court<br>Singapore 069538<br>Singapore | | $442,001.97 |
| Taishin<br>No. 118, Sec 4, Ren-ai Rd<br>Da-an District<br>Taipei City 106<br>Taiwan | | $400,000.00 |
| Deloitte & Touche Fin Adv<br>32/F Once Pacific Place<br>88 Queensway<br>Hong Kong | | $384,615.38 |
| RSM Corp Advisory HK Ltd<br>29th Lee Garden Two<br>28 Yun Ping Road<br>Causeway Bay<br>Hong Kong | | $384,615.38 |
| Guangtai Trading Ltd<br>Trust Company Complex<br>Ajeltake Rd, Majuro<br>Rep of the Marshall Is<br>MH96960 | | $345,552.85 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Sang Il Trading Co Ltd.<br>Rm 504, 125 Wonyang-Ro<br>Seo-Gu, Busan 602-030<br>South Korea | | $342,854.34 |
| Atl Pacific Fishing Ltd<br>Erf 2347 10th Street East<br>Industrial Area<br>PO Box 658 Walvisbay<br>Republic of Namibia | | $341,149.04 |
| PricewaterhouseCoopersLtd<br>22/F Prince's Building<br>Central<br>Hong Kong | | $256,410.26 |
| Deloitte Touche Tohmatsu<br>35/F One Pacific Place<br>88 Queensway<br>Hong Kong | | $251,282.05 |
| Qingdao Jncai Plgic Fish<br>No. 1 Chang An Rd<br>4th Fl, Shibei District<br>Qingdao City 266000<br>Shandong Prov China | | $231,150.26 |
| Rngchng Lngyn Ship Agcy<br>Xixiakou County<br>ChengShan Town<br>RongCheng City<br>Shandong, China | | $209,624.79 |
| Baker & McKenzie<br>14/F, Hutchison House<br>10 Harcourt Road<br>Central<br>Hong Kong | | $200,275.17 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Andes Intl Qingdao Shp 4F N67 Yin Chuan Xi Rd Bk D Qingdao Amination Ind Pk ShinanDstQingdaoCty 266000 Shandong Province, China | | $173,231.12 |
| Andes Intl Qingdao Shp 4F N67 Yin Chuan Xi Rd Bk D Qingdao Amination Ind Pk ShinanDstQingdaoCty 266000 Shandong Province, China | | $173,231.12 |
| Sifang Dist Haiynbo Ship Accessories Supply Center No.7 Wen Zhou Rd Qingdao Shandong, China | | $158,265.60 |
| QINGDAO SHNGBNGKN TRD Trde Cntr Chengyang Vil Chengyang Street Chengyang District Qingdao Shandong China | | $148,924.23 |
| Andes Int'l Shpng Agcy N67 Yin Chuan Xi Rd, Bl D Qingdao Amntn Ind Pk 4Fl Qingdao City 266000 Shandong Province, China | | $118,175.80 |
| Qingdao Drfng Gng Co Ltd No.31 Yongping Rd Qingdao, China | | $116,914.30 |
| Rngchng Hetai Shngm Co Rongcheng Bay Street Office Xuangzhen Village Shandong, China | | $115,366.89 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Mourant Ozannes Serv Ltd<br>13/F Entertainment Bldng<br>30 Queen's Road<br>Central<br>Hong Kong | | $110,947.45 |
| City N Dst, Shanghai Elec<br>Huatong Elec Dstr Dept<br>No.232<br>Weihai Road, Qingdao<br>Shandong, China | | $101,884.29 |
| Alatir Ltd.<br>No 80 Raffles Pl, #26-02<br>UOB Plaza One<br>Singapore 048625 | | $104,286,159.88 |
| Epiq Systems Limited<br>1102-1104 Central Plaza<br>18 Harbour Road<br>Wanchai<br>Hong Kong | | $95,668.67 |
| Shell Marine Prod Sing<br>Metropolis Tower 1<br>9N Buona Vsta Dr, 07-01<br>Singapore 138588 | | $83,454.00 |
| Shangong Haoyuntong<br>Nets Technology Co., Ltd<br>No.318 Muyun Rd<br>Shidao, Rongcheng<br>Shandong, China | | $81,545.81 |
| Sang Il Trading Co Ltd<br>Rm 504, 125, Wonyang-Ro<br>Seo-Gu, Busan 602-030<br>South Korea | | $77,827.48 |

| Name of creditor and complete mailing address, including zip code | Indicate if claim is contingent, unliquidated, or disputed | Unsecured Claim Amount[2] |
|---|---|---|
| | | |
| Perun Ltd.<br>No 80 Raffles Pl, #26-01<br>UOB Plaza One<br>Singapore 048624 | | Unliquidated |

EXHIBIT  C

EXHIBIT C

CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.
BALANCE SHEETS
(Unaudited)
5/28/16
(in USD)

| | 1 N.S. Hong Investment (BVI) Limited (a) | 2 Pacific Andes International Holdings Limited (Bermuda) | 3 Super Investment Limited (Cayman) | 4 China Fishery Group Limited (Cayman) | 5 Smart Group Limited (Cayman) | 6 CFG Peru Investment Pte. Ltd. (Singapore) | 7 Protein Trading Limited (Samoa) |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | | | | |
| **Investments** | | | | | | | |
| Investment in Subsidiaries | $ 247,579,852 | $ 5,375,117 | $ 418,305,842 | $ 27,800,001 | $ 30,504,740 | $ 365,504,147 | $ - |
| Held to maturity Financial assets | | | | 3,059,583 | | | |
| Investment Properties | | | | | | | |
| Other | | 1,897,436 | | | | | |
| Total Investments | 247,579,852 | 7,272,552 | 418,305,842 | 30,859,584 | 30,504,740 | 365,504,147 | - |
| | | | | | | | |
| Cash | 73,025 | 56,748 | 500 | (5,749) | | (1) | 49,675 |
| | | | | | | | |
| Trade Receivables | | | | | | | 1,115,770 |
| Deferred Charter Hire | | | | | | | |
| Due from Affiliates | | 568,041,445 | | 861,756,379 | | | 23,044,357 |
| | | | | | | | |
| Inventories - supplies | | | | | | | |
| | | | | | | | |
| **Fixed Assets** | | | | | | | |
| Leaseholds & Buildings | | | | | | | |
| PP&E | | | | | | | |
| Construction in Process | | | | | | | |
| FF&E | | | | | | | |
| Other | | | | | | | |
| total Fixed Assets | - | - | - | - | - | - | - |
| Accumulated Depreciation | | | | | | | |
| Net Fixed Assets | - | - | - | - | - | - | - |
| | | | | | | | |
| Deposits and Prepayments | | | | 3,015,592 | | 17,393,250 | |
| Other Assets | | 43,981 | | 97,500 | | | |
| | | | | | | | |
| **Total Assets** | $ 247,652,877 | $ 575,414,726 | $ 418,306,342 | $ 895,723,307 | $ 30,504,740 | $ 382,897,396 | $ 24,209,802 |

1

EXHIBIT C

CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.
BALANCE SHEETS
(Unaudited)
5/28/16
(in USD)

| | 1 N.S. Hong Investment (BVI) Limited (a) | 2 Pacific Andes International Holdings Limited (Bermuda) | 3 Super Investment Limited (Cayman) | 4 China Fishery Group Limited (Cayman) | 5 Smart Group Limited (Cayman) | 6 CFG Peru Investment Pte. Ltd. (Singapore) | 7 Protein Trading Limited (Samoa) |
|---|---|---|---|---|---|---|---|
| **Liabilities** | | | | | | | |
| Accounts Payable | | | | | | | |
| Due to Affiliates | 247,652,867 | | | | | | |
| Due to Shareholders | | | | $ 516,978 | | $ 25,063 | |
| Bank Loans | | | 291,536,123 | | 72,804,614 | 383,037,793 | |
| Promissory Notes Payable | | | | | | | |
| Trust Receipt Loans | | | | | | | |
| Other | | 17,823 | | 110,449 | 100 | | |
| Financial Guarantee Contract | | | | 4,068,293 | | | |
| Senior notes | | | | | | | |
| Derivative Financial Investments | | | | 10,824,565 | | | |
| **Total liabilities** | 247,652,867 | 17,823 | 291,536,123 | 15,520,284 | 72,804,714 | 383,062,856 | - |
| **Shareholders Equity:** | | | | | | | |
| Share capital | 10 | 90,809,013 | 1,000 | 184,171,909 | 1 | 1 | 1 |
| Share Premium | | 427,758,273 | 30,503,637 | 646,805,588 | | | |
| Contributed Surplus | | 5,028,818 | | | | | |
| Properties Revaluation Reserve | | | | | | | |
| Retained Earnings | | 51,800,799 | 96,265,582 | 49,225,526 | (42,299,975) | (165,461) | 24,209,801 |
| **Total shareholders equity** | 10 | 575,396,903 | 126,770,219 | 880,203,023 | (42,299,974) | (165,460) | 24,209,802 |
| **Total Liabilities and Equity** | $ 247,652,877 | $ 575,414,726 | $ 418,306,342 | $ 895,723,307 | $ 30,504,740 | $ 382,897,396 | $ 24,209,802 |

(a) NS Hong balance sheet as of 5/31/16.

Above information subject to change.  The above analysis has not been audited and has been provided based on
information available at the time.

2

EXHIBIT  C

**CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.**
**BALANCE SHEETS**
(Unaudited)
5/28/16
(in USD)

| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|
| | South Pacific Shipping Agency Ltd (BVI) | China Fisheries International Limited (Samoa) | Chanery Investment Inc. (BVI) | Champion Maritime Ltd (BVI) | Growing Management Limited (BVI) | Target Shipping Limited (HK) | Fortress Agents Limited (BVI) |
| **Assets** | | | | | | | |
| _Investments_ | | | | | | | |
| Investment in Subsidiaries | | $        518 | $  2,000,000 | $  5,349,752 | | | |
| Held to maturity Financial assets | | | | | | | |
| Investment Properties | | | | | | | |
| Other | | | | | | | |
| Total Investments | - | 518 | 2,000,000 | 5,349,752 | - | - | - |
| | | | | | | | |
| Cash | 160,812 | 111,127 | 263,817 | 38,186 | 2,199 | | (0) |
| | | | | | | | |
| Trade Receivables | | | | | | | |
| Deferred Charter Hire | | 30,645,186 | 89,145,246 | | | | 185,588,506 |
| Due from Affiliates | | | | | | | |
| | | | | | | | |
| Inventories - supplies | 2,962,255 | | 3,988,561 | | | | |
| | | | | | | | |
| _Fixed Assets_ | | | | | | | |
| Leaseholds & Buildings | | | 4,328,201 | | | | |
| PP&E | 29,039,104 | | | | | | |
| Construction in Process | | 375,051 | | | 20,679,434 | | |
| FF&E | | | 392,361 | | | | |
| Other | | | | | | | |
| total Fixed Assets | 29,039,104 | 375,051 | 4,720,561 | - | 20,679,434 | - | - |
| Accumulated Depreciation | (2,298,929) | | (481,499) | | | | |
| Net Fixed Assets | 26,740,175 | 375,051 | 4,239,063 | - | 20,679,434 | - | - |
| | | | | | | | |
| Deposits and Prepayments | | 79,504,306 | 275,905 | 390,000 | 1,910,875 | | |
| Other Assets | 1,236,919 | | | | | | |
| | | | | | | | |
| **Total Assets** | $  31,100,161 | $  110,636,188 | $  99,912,592 | $  5,777,938 | $  22,592,508 | $        - | $  185,588,506 |

EXHIBIT C

CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.
BALANCE SHEETS
(Unaudited)
5/28/16
(in USD)

| | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|
| | South Pacific Shipping Agency Ltd. (BVI) | China Fisheries International Limited (Samoa) | Chanery Investment Inc. (BVI) | Champion Maritime Ltd (BVI) | Growing Management Limited (BVI) | Target Shipping Limited (HK) | Fortress Agents Limited (BVI) |
| **Liabilities** | | | | | | | |
| Accounts Payable | $ 34,042,770 | $ (327,503,100) | $ 96,895,141 | $ (650,445) | $ 51,587,338 | | $ (2,862,555) |
| Due to Affiliates | 3,148,598 | 820,967,405 | | 7,587,163 | 39,241,568 | 4,385,413 | |
| Due to Shareholders | | | | | | | |
| Bank Loans | | 28,411,516 | | | | | |
| Promissory Notes Payable | | 11,937,119 | | | | | |
| Trust Receipt Loans | | | | 1,478,224 | | | |
| Other | 2,971,294 | 575,448 | | | | | |
| Financial Guarantee Contract | | | | | | | |
| Senior notes | | | | | | | |
| Derivative Financial Investments | | 2,451,087 | | | | | |
| **Total liabilities** | 40,162,663 | 536,839,476 | 96,895,141 | 8,414,941 | 90,828,906 | 4,385,413 | (2,862,555) |
| **Shareholders Equity:** | | | | | | | |
| Share capital | 1 | 1,000 | 1 | 2 | 1 | 0 | 2 |
| Share Premium | | | | | | | |
| Contributed Surplus | | | | | | | |
| Properties Revaluation Reserve | | | 3,979,534 | | | | |
| Retained Earnings | (9,062,503) | (426,204,288) | (962,084) | (2,637,006) | (68,236,400) | (4,385,413) | 188,451,058 |
| **Total shareholders equity** | (9,062,502) | (426,203,288) | 3,017,451 | (2,637,004) | (68,236,399) | (4,385,413) | 188,451,060 |
| **Total Liabilities and Equity** | $ 31,100,161 | $ 110,636,188 | $ 99,912,592 | $ 5,777,938 | $ 22,592,508 | $ - | $ 185,588,506 |

4

EXHIBIT C

**CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.**
**BALANCE SHEETS**
(Unaudited)
5/28/16
(in USD)

| | 15<br>Ocean Expert<br>International<br>Limited (BVI) | 16<br>CFGL<br>(Singapore)<br>Private Ltd |
|---|---|---|
| **Assets** | | |
| Investments | | |
| Investment in Subsidiaries | | |
| Held to maturity Financial assets | | |
| Investment Properties | | 2,948,715 |
| Other | | |
| Total Investments | - | 2,948,715 |
| | | |
| Cash | | 7,707 |
| | | |
| Trade Receivables | | |
| Deferred Charter Hire | | |
| Due from Affiliates | 565,789,262 | |
| Inventories - supplies | | |
| | | |
| Fixed Assets | | |
| Leaseholds & Buildings | | 4,910,252 |
| PP&E | | |
| Construction in Process | | |
| FF&E | | 370,999 |
| Other | | |
| total Fixed Assets | - | 5,281,250 |
| Accumulated Depreciation | | (485,571) |
| Net Fixed Assets | - | 4,795,679 |
| | | |
| Deposits and Prepayments | | |
| Other Assets | | 1,008 |
| | | |
| **Total Assets** | $ 565,789,262 | $ 7,753,109 |

5

EXHIBIT C

**CHINA FISHERY GROUP LIMITED (CAYMAN), et. al.**
**BALANCE SHEETS**
(Unaudited)
5/28/16
(In USD)

| | 15<br>Ocean Expert<br>International<br>Limited (BVI) | 16<br>CFGL<br>(Singapore)<br>Private Ltd |
|---|---|---|
| **Liabilities** | | |
| Accounts Payable | $    127,726,213 | |
| Due to Affiliates | | 5,039,297 |
| Due to Shareholders | | |
| Bank Loans | | |
| Promissory Notes Payable | | |
| Trust Receipt Loans | | |
| Other | | 33,821 |
| Financial Guarantee Contract | | |
| Senior notes | | |
| Derivative Financial Investments | | |
| **Total liabilities** | 127,726,213 | 5,073,117 |
| **Shareholders Equity:** | | |
| Share capital | 1 | 1 |
| Share Premium | | |
| Contributed Surplus | | |
| Properties Revaluation Reserve | | 4,072,551 |
| Retained Earnings | 438,063,049 | (1,392,560) |
| **Total shareholders equity** | 438,063,049 | 2,679,991 |
| **Total Liabilities and Equity** | $    565,789,261 | $    7,753,109 |

9

EXHIBIT  D

**EXHIBIT D**

**Premises Owned, Leased Or Held Under Other Arrangement From Which The Debtors Operate Their Business**

| Debtor | Premises | Area in sq. meter | Current use |
|---|---|---|---|
| Chanery Investment Inc | Office no 12 -14 on 33rd Floor, Hong Kong Plaza, 188 Connaught Road West, Hong Kong | 306.02 | Debtors' Office Space |
| CFGL (Singapore) Private Limited | Office No 11-01 on 11th Floor, GB Building, 143 Cecil Street, Singapore 069542 | 315.00 | Debtors' Office Space |
| CFGL (Singapore) Private Limited | Office No 11-02 on 11th Floor, GB Building, 143 Cecil Street, Singapore 069542 | 189.00 | Leased out for a term from 1 October 2015 to 30 September 2016 at a monthly rental of S$15,458.40 (equivalent to US$11,387.74) |

1126016

EXHIBIT E

EXHIBIT E

**SUMMARY OF MAJOR ASSETS OUTSIDE THE UNITED STATES**

| Entity | General Ledger Account | G/L Balance Amount | Description | Location of Asset |
|---|---|---|---|---|
| **NS Hong** | | | | |
| | | | | |
| | PAIH stock (3,889,917,651 shares) | 235,593,457.20 | approx. 54% interest in PAIH, a listed company in Hong Kong | Hong Kong |
| | Inv - D Law | 2,786,394.85 | 50% investment in a global research company to provide database search for any litigation in Hong Kong | Hong Kong |
| | Terra Global Capital (Coal) | 7,200,000.00 | a greenfield project in coal mine | Indonesia |
| | Inv - Time Medical Holdings | 2,000,000.00 | a minority investment in a Singapore private company engaged in medical appliance | Singapore |
| | | 247,579,852.05 | | |
| | | | | |
| **PAIH** | | | | |
| | Held for Trading Investments | | | |
| | The Hong Kong Golf Club membership - Nominee membership cert #936 | 653,846.15 | Corporate golf club membership | Hong Kong |
| | The Hong Kong Golf Club membership - Nominee membership cert #1024 | 576,923.08 | Corporate golf club membership | Hong Kong |
| | The Hong Kong Golf Club membership - Nominee membership cert #1031 | 576,923.08 | Corporate golf club membership | Hong Kong |
| | Entrance fee - Five Day Membership | 44,871.79 | | Hong Kong |
| | Entrance fee - Five Day Membership | 44,871.79 | | Hong Kong |
| | | 1,897,435.90 | | |
| | | | | |
| | Investment in subsidiaries | | | |
| | - Pacific Andes International (BVI) Limited | | | |
| | * 1 Share @ USD1.00 at par | 5,375,115.51 | 100% investment which in turn holds the operating companies of PAIH group engages in frozen seafood products | BVI |

1

| Entity | General Ledger Account | G/L Balance Amount | Description | Location of Asset |
|---|---|---|---|---|
| | | | processing | |
| | | | | |
| | - Clamford Holding Limited | | | |
| | * 1 Share @ USD1.00 at par | 1.00 | 100% investment which in turn holds 65% interest in Pacific Andes Resources Development Ltd, a public listed company in Singapore | Bermuda/Singapore |
| **Super Investments Limited** | | | | |
| | Shares in China Fishery Group Limited # of shares 2567579130 | 418,305,842.13 | 69.7% in China Fishery Group Limited, which is listed on Singapore Stock Exchange | Cayman/ Singapore |
| **CFGL** | | | | |
| | INVESTMENTS IN SUBSIDIARIES | 27,800,001.00 | 100% investment in Smart Group Limited which in turn holds Peruvian assets, South Pacific fleet | Cayman |
| | HELD-TO-MATURITY FINANCIAL ASSETS | 3,059,583.33 | represents nominal value of US$4M in CFGI senior notes | Peru |
| | TRADE RECEIVABLES - INTERCOM | 861,756,379.30 | represents amount due from Smart Group Ltd | Cayman |
| | Deposits and prepayments | 3,015,591.95 | represents prepayment of legal fee. | |
| | | | | |
| **Smart Group** | | | | |
| | 3000010  INVESTMENTS IN SUBSIDIARIES | 30,504,740.36 | investments in CFG Peru investments which holds Peru assets, Brandberg (Mauritius) investment which engage in fishing Namibia | Singapore, Mauritius |
| | | | | |
| **CFG Peru** | | | | |
| | 3000010  INVESTMENTS IN SUBSIDIARIES | 365,504,147.15 | investment in CFG Investment SAC which holds Peruvian fishing assets | Peru |
| | 12200050  OTHER RECEIVABLE - FI | 17,393,250.00 | Fair value of guarantee provided to CFG Investment SAC on senior notes | Peru |
| | | | | |
| **Protein** | | | | |
| | 12000010  TRADE RECEIVABLES | 1,115,769.60 | Qingdao Deepsea Fishery Co Ltd | China |
| | 12000020  TRADE RECEIVABLES - INTERCOM | 23,044,357.19 | CFIL | Samoa |
| | | | | |
| **South Pacific** | | | | |
| | 2000080  FISHING | | fishing equipment on board of | Peru |

| Entity | General Ledger Account | G/L Balance Amount | Description | Location of Asset |
|---|---|---|---|---|
| | VESSELS | 26,740,174.73 | vessels | |
| | 12200050 OTHER RECEIVABLE - FI | 1,236,919.20 | | |
| | 13200020 INVENTORIES - SUPPLIES | 2,962,254.98 | | Peru |
| | | | | |
| CFIL | | | | |
| | 2000120 CONSTRUCTION-IN-PROGRESS | 375,050.91 | | |
| | 3000070 DERIVATIVE FINANCIAL INSTRUMENTS | (2,451,087.12) | | |
| | Prepayment under Long Term Supply Agreement | 30,645,185.72 | Prepayment to Perun Limited and Alatir Limited under Long Term Supply Agreement | BVI |
| | 16000040 DEPOSIT ADVANCE | 40,500,000.00 | advances to Perun Limited | BVI |
| | 16000120 PREPAYMENT - OTHERS | 39,004,306.37 | amount due form Perun Limited | BVI |
| | | | | |
| Chanery | | | | |
| | 2000010 LEASEHOLD LAND AND BUILDINGS | 4,328,200.80 | Office no 12 -14 on 33rd Floor, Hong Kong Plaza, 188 Connaught Road West, Hong Kong | Hong Kong |
| | 2000040 FURNITURE & FIXTURE | 165,053.19 | | Hong Kong |
| | 2000050 OFFICE EQUIPMENT | 57,051.23 | | Hong Kong |
| | 2000060 MOTOR VEHICLES | 170,256.23 | | Hong Kong |
| | 3000010 INVESTMENTS IN SUBSIDIARIES | 2,000,000.00 | investment in Powertech (Qingdao) Engineering Co Ltd | China |
| | 12200020 TRADE RECEIVABLES - INTERCOM | 89,145,246.15 | China Fisheries International Limited | Samoa |
| | 13200020 INVENTORIES - SUPPLIES | 3,988,560.51 | spare parts for vessels | China |
| | 16000040 DEPOSIT ADVANCE | 251,881.26 | | Hong Kong |
| | 16000120 PREPAYMENT - OTHERS | 24,023.90 | | Hong Kong |
| | | | | |
| Champion | | | | |
| | 3000010 INVESTMENTS IN SUBSIDIARIES | 5,349,752.00 | 100% equity in CFG (Singapore) Private Limited | Singapore |
| | 12200050 OTHER | | | |

| Entity | General Ledger Account | G/L Balance Amount | Description | Location of Asset |
|---|---|---|---|---|
| | RECEIVABLE - FI | 390,000.00 | | |
| | | | | |
| **Growing** | | | | |
| | 2000120 CONSTRUCTION-IN-PROGRESS | 20,679,433.64 | certain fishing equipment | South Korea |
| | 12200050 OTHER RECEIVABLE - FI | 1,910,875.05 | | |
| | | | | |
| **Target** | | | | |
| | N/A | | | |
| | | | | |
| **Fortress** | | | | |
| | 12000020 TRADE RECEIVABLES - INTERCOM | 185,588,505.70 | China Fisheries International Limited | Samoa |
| | | | | |
| **Ocean** | | | | |
| | 12000020 TRADE RECEIVABLES - INTERCOM | 565,789,262.30 | China Fisheries International Limited | Samoa |
| | | | | |
| **CFGL (Singapore)** | | | | |
| | 2000010 LEASEHOLD LAND AND BUILDINGS | 4,910,251.50 | Office No 11-01 on 11th Floor, GB Building, 143 Cecil Street, Singapore 069542 | Singapore |
| | 2000040 FURNITURE & FIXTURE | 370,998.77 | Office furniture | Singapore |
| | 2000150 INVESTMENT PROPERTIES | 2,948,715.00 | Office No 11-02 on 11th Floor, GB Building, 143 Cecil Street, Singapore 069542 | Singapore |

4

EXHIBIT E

SUMMARY OF ASSETS LOCATED OUTSIDE THE UNITED STATES

| Name of Companies | Bank | Locat | A/C No | CCY | 27/6 Org Ccy Amt | Ex. Rate | Details USD | Total USD |
|---|---|---|---|---|---|---|---|---|
| N S Hong Investment BVI Limited | SCB | HK | 788-9 | HKD | 62,896.74 | 7.80000 | 8,063.68 | 65,980.88 |
| | SCB | HK | 888-3 | USD | 330.32 | 1.00000 | 330.32 | |
| | HSBC | HK | 7-001 | HKD | 115,273.57 | 7.80000 | 14,778.66 | |
| | HSBC | HK | 6374 | HKD | 57,150.06 | 7.80000 | 7,326.93 | |
| | HSBC | HK | 4574 | USD | 33,679.78 | 1.00000 | 33,679.78 | |
| | HSBC | HK | 4574 | SGD | 2,424.12 | 0.74316 | 1,801.51 | |
| **PAIH** | | | | | | | | |
| PAIH | BOC | HK | 5606-3 | HKD | 0.00 | 7.80000 | 0.00 | 47,889.50 |
| | BOC | HK | 5609-2 | HKD | 0.00 | 7.80000 | 0.00 | |
| | DBS | HK | 8011 | HKD | 0.00 | 7.80000 | 0.00 | |
| | DBS | HK | 8098 | HKD | 0.00 | 7.80000 | 0.00 | |
| | DBS | HK | 460 | HKD | 8,263.06 | 7.80000 | 1,059.37 | |
| | DBS | HK | 1360 | USD | 6,815.26 | 1.00000 | 6,815.26 | |
| | Maybank | HK | 34/09 | USD | 0.00 | 1.00000 | 0.00 | |
| | Maybank | HK | 56/03 | HKD | 0.00 | 7.80000 | 0.00 | |
| | RABOBANK | HK | 111 | USD | 5,692.15 | 1.00000 | 5,692.15 | |
| | SCB | HK | 3339 | HKD | 39,445.41 | 7.80000 | 5,057.10 | |
| | SCB | HK | 9421 | HKD | 134,546.91 | 7.80000 | 17,249.60 | |
| | SCB | HK | 9448 | HKD | 31,091.60 | 7.80000 | 3,986.10 | |
| | SCB | HK | 9456 | HKD | 50,662.76 | 7.80000 | 6,495.23 | |
| | SCB | HK | 7773 | SGD | 1,377.91 | 0.74316 | 1,024.01 | |
| | SCB | HK | 3881 | USD | 510.68 | 1.00000 | 510.68 | |
| **PARD** | | | | | | | | |
| Super Investment | HSBC | HK | 4-001 | HKD | 5,825.82 | 7.80000 | 746.90 | 746.90 |
| **CFGL** | | | | | | | | |
| CFGL | China CITIC | HK | 8000 | HKD | 12,765.00 | 7.80000 | 1,636.54 | 15,298.47 |
| | China CITIC | HK | 4201 | USD | 100.37 | 1.00000 | 100.37 | |
| | HSBC | HK | 9579/AUD | AUD | 0.00 | 0.74550 | 0.00 | |
| | HSBC | HK | 9579/EUR | EUR | 0.00 | 1.12580 | 0.00 | |
| | HSBC | HK | 8-001 | HKD | 11,768.23 | 7.80000 | 1,508.75 | |
| | HSBC | HK | 9579/SGD | SGD | 0.00 | 0.74316 | 0.00 | |
| | HSBC | HK | 9579/USD | USD | 754.37 | 1.00000 | 754.37 | |
| | RABOBANK | HK | 0111 | USD | 1,411.88 | 1.00000 | 1,411.88 | |
| | RABOBANK | HK | 3411 | SGD | 11,303.78 | 0.74316 | 8,400.52 | |
| | SCB | HK | 6574 | HKD | 0.00 | 7.80000 | 0.00 | |
| | SCB | HK | 1081 | USD | 1,486.04 | 1.00000 | 1,486.04 | |
| Smart Group | (No Bank Account) | | | | | | 0.00 | 0.00 |
| CFG Peru Investment | (No Bank Account) | | | | | | 0.00 | |
| Protein Trading Limited | China CITIC | HK | 3502 | JPY | 0.00 | 0.00954 | 0.00 | 30,681.78 |
| | China CITIC | HK | 3501 | USD | 4,961.75 | 1.00000 | 4,961.75 | |
| | DBS | HK | 3350 | USD | 0.10 | 1.00000 | 0.10 | |
| | HSBC | HK | 4-001 | HKD | (75.00) | 7.80000 | (9.62) | |
| | HSBC | HK | 9755/JPY | JPY | 0.00 | 0.00954 | 0.00 | |
| | HSBC | HK | 9755/USD | USD | 0.00 | 1.00000 | 0.00 | |
| | RABOBANK | HK | 2111 | JPY | 0.00 | 0.00954 | 0.00 | |
| | RABOBANK | HK | 111 | USD | 9,278.64 | 1.00000 | 9,278.64 | |
| | SCB | HK | 8738 | EUR | 0.00 | 1.12580 | 0.00 | |
| | SCB | HK | 8711 | USD | 16,450.91 | 1.00000 | 16,450.91 | |
| South Pacific Shipping Agency | HSBC | HK | 9855/EUR | EUR | 0.00 | 1.12580 | 0.00 | 181,958.55 |
| | HSBC | HK | 2-001 | HKD | (75.00) | 7.80000 | (9.62) | |
| | HSBC | HK | 9855/JPY | JPY | 1.00 | 0.00954 | 0.01 | |
| | HSBC | HK | 9855/SGD | SGD | 0.00 | 0.74316 | 0.00 | |
| | HSBC | HK | 9855/USD | USD | 181,968.16 | 1.00000 | 181,968.16 | |
| CFIL | China CITIC | HK | 5001 | USD | 1,388.03 | 1.00000 | 1,388.03 | 20,078.10 |
| | DBS | HK | 8950 | USD | 0.21 | 1.00000 | 0.21 | |
| | HSBC | HK | 7761/AUD | AUD | 0.00 | 0.74550 | 0.00 | |
| | HSBC | HK | 7761/EUR | EUR | 0.00 | 1.12580 | 0.00 | |
| | HSBC | HK | 1-001 | HKD | 330.01 | 7.80000 | 42.31 | |
| | HSBC | HK | 7761/JPY | JPY | 0.00 | 0.00954 | 0.00 | |
| | HSBC | HK | 7761/NZD | NZD | 0.00 | 0.71370 | 0.00 | |
| | HSBC | HK | 7761/SGD | SGD | 0.00 | 0.74316 | 0.00 | |
| | HSBC | HK | 7761/USD | USD | 4,338.72 | 1.00000 | 4,338.72 | |
| | HSBC | HK | 1-274/USD/STMT | USD | 11,715.05 | 1.00000 | 11,715.05 | |
| | RABOBANK | HK | 111 | USD | 730.79 | 1.00000 | 730.79 | |
| | RABOBANK | HK | 112 | USD | 1,862.91 | 1.00000 | 1,862.91 | |
| | SCB | HK | 5659 | HKD | 0.00 | 7.80000 | 0.00 | |
| | SCB | HK | 9036 | USD | 0.08 | 1.00000 | 0.08 | |
| Chanery Investment Inc | (No Bank Account) | | | | | | | |
| Champion Maritime | SCB | HK | 1796 | USD | 17,081.16 | 1.00000 | 17,081.16 | 17,081.16 |
| Growing Management | HSBC | HK | 9848/EUR | EUR | 0.00 | 1.12580 | 0.00 | (9.62) |
| | HSBC | HK | 2-001 | HKD | (75.00) | 7.80000 | (9.62) | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | HSBC | HK | 9848/JPY | JPY | | 0.00 | 0.00954 | 0.00 |
| | HSBC | HK | 9848/USD | USD | | 0.00 | 1.00000 | 0.00 |
| Target Shipping | (No Bank Account) | | | | | | | |
| Fortress Agent | HSBC | HK | 7766/EUR | EUR | | 0.00 | 1.12580 | 0.00 | (9.62) |
| | HSBC | HK | 1-001 | HKD | | (75.00) | 7.80000 | (9.62) |
| | HSBC | HK | 7766/JPY | JPY | | 0.00 | 0.00954 | 0.00 |
| | HSBC | HK | 7766/SGD | SGD | | 0.00 | 0.74316 | 0.00 |
| | HSBC | HK | 7766/USD | USD | | 0.00 | 1.00000 | 0.00 |
| Ocean Expert | (No Bank Account) | | | | | | | |
| CFGL (Siingapore) Private Ltd | UOB | Singapore | 664-4 | SGD | | 49,390.77 | 0.74316 | 36,705.24 | 39,430.67 |
| | UOB | Singapore | 065-5 | USD | | 2,725.43 | 1.00000 | 2,725.43 |

304,509.49

| Exchange Rate : | HKD | 7.80000 |
|---|---|---|
| | USD | 1.00000 |
| | AUD | 0.74550 |
| | EUR | 1.12580 |
| | SGD | 0.74316 |
| | JPY | 0.00954 |
| | NZD | 0.71370 |

EXHIBIT  F

**EXHIBIT F**

**Pending Litigation**

| CAPTION OR PARTIES | COURT | DOCKET NO. | DESCRIPTION |
|---|---|---|---|
| In the Matter of the Companies Law (2013 Revision) and in The Matter of China Fishery Group Limited | Grand Court of the Cayman Islands Financial Services Division | Cause No: FSD 186 QF 2015 (AJJ) | Action for the appointment of provisional liquidators. This action is resolved but may still be pending. |
| In the Matter of the Companies (Winding Up and Miscellaneous Provisions) Ordinace (CAP 32) and In the Matter of China Fishery Group Limited | High Court of the Hong Kong Special Administrative Region Court of First Instance | HCCW 367/2015 | Action for the appointment of provisional liquidators. This action is resolved but may still be pending |
| Plaintiff: Korea Development Bank<br><br>Defendant: Growing Management Limited | Dalian Maritime Court, China | Case No 19, Letter Chu, Foreign, Dalian Maritime (2013) | Action by Korean Development Bank based on debtor's arrest of ship allegedly owned by Korean National Bank. |
| Plaintifff: Praxis Energy Agents LLC<br><br>Defendants: MV Yu Fu, Target Shipping Limited, et al. | Supreme Court of Bangladesh High Court Division | Admiralty Suit No 11 of 2011 | Action against Target Shipping Limited (a debtor) to set aside arrest of ship and claim of vender that supplied bunkers to prior owner of the vessel, which is MV Yu Fu, a non-debtor. |

1126102

EXHIBIT  G

## EXHIBIT G

## OFFICERS AND DIRECTORS

| NS HONG | |
|---|---|
| | |
| **NAME OF OFFICER** | **TITLE** |
| Teh Hong Eng | Director |
| Ng Joo Kwee | Director |
| Ng Joo Puay | Director |
| Ng Puay Yee | Director |
| | |

| PAIH | |
|---|---|
| | |
| **NAME OF OFFICER** | **TITLE** |
| Teh Hong Eng | Chairperson, Director |
| Ng Joo Kwee | Director |
| Frank Ng Joo Puay | Director |
| Annie Ng Puay Yee | Managing Director |
| LEW V Robert | Non-Executive Director |
| Clement TAO Kwok Lau | Non-Executive Director |
| Peter NGUYEN Van Tu | Non-Executive Director |
| CHAN Tak Hei | Company Secretary |
| NG Weng Sin | Group Financial Controller |
| | |

| SUPER INVESTMENT | |
|---|---|
| | |
| **NAME OF OFFICER** | **TITLE** |
| Frank Ng Joo Puay | Director |
| Ng Joo Puay | Director |
| Sung Yu Ching | Director |
| | |

**CFGL**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Executive Chairman, Director |
| Annie Ng Puay Yee | Managing Director |
| Sung Yu Ching | Managing Director |
| Paul Jeremy Brough | Chief Restructuring Officer, Director |
| TAN Ngiap Joo | Non-Executive Director |
| TSE Man Bun | Non-Executive Director |
| LIM Soon Hock | Non-Executive Director |
| WAN Lynn Tiew Leng | Company Secretary |
| NG Weng Sin | Group Financial Controller |

**SMART GROUP**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Ng Joo Thieng | Director |
| Ng Puay Yee, Annie | Director |
| | |

**CFG PERU INVESTMENT**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Ng Joo Thieng | Director |
| Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| Quck Wee Lin | Director |
| | |

**PROTEIN TRADING LIMITED**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Ng Joo Thieng | Director |
| Frank Ng Joo Puay | Director |
| Ng Puay Yee | Director |
| | |

2

**SOUTH PACIFIC SHIPPING AGENCY**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Annie Ng Puay Yee | Director |
| Sung Yu Ching | Director |
| | |

**PREMIUM CHOICE**

| NAME OF OFFICER | TITLE |
|---|---|
| Annie Ng Puay Yee | Director |
| First Treasure Development Ltd. | Director |
| | |

**CFIL**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Frank Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| Sung Yu Ching | Director |
| | |

**RINGSTON HOLDINGS**

| NAME OF OFFICER | TITLE |
|---|---|
| Yianna Alexandrou | Director |
| | |

**CHANERY INVESTMENT INC.**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Frank Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| Sung Yu Ching | Director |
| | |

**CHAMPION MARITIME**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Annie Ng Puay Yee | Director |
| Sung Yu Ching | Director |
| | |

**GROWING MANAGEMENT**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Frank Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| | |

**TARGET SHIPPING**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Frank Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| | |

**FORTRESS AGENT**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Annie Ng Puay Yee | Director |
| Sung Yu Ching | Director |
| | |

**OCEAN EXPERT**

| NAME OF OFFICER | TITLE |
|---|---|
| Ng Joo Kwee | Director |
| Annie Ng Puay Yee | Director |
| | |

4

| CFGL (SINGAPORE) PRIVATE LTD. | |
| --- | --- |
| **NAME OF OFFICER** | **TITLE** |
| Ng Joo Puay | Director |
| Annie Ng Puay Yee | Director |
| Quck Wee Lin | Director |
| | |

1126057

EXHIBIT  H

## EXHIBIT H

## Projected Thirty (30) Day Payroll

**China Fisheries International Limited**

| Employee name | Title | Currency | Monthly salary | |
| --- | --- | --- | --- | --- |
| | | | Amount | US$ equivalent |
| | | | | |
| Roman Emelyanov | Head Engineer | USD | 5,000.00 | $5,000.00 |
| Alexander Savichev | Technical Manager of South Pacific Fleet | USD | 5,000.00 | 5,000.00 |
| Vladiir Tarikovics | Chief Radio Officer for Fleet | USD | 3,800.00 | 3,800.00 |
| Grace Goh | Accountant | SGD | 4,500.00 | 3,315.01 |
| Jose Miguel Tirado | General Manager | USD | 14,500.00 | 14,500.00 |
| | | | | $31,615.01 |
| Exchange rate : | | | | |
| US$ : S$ | 1.35746 | | | |

**Pacific Andes International Holdings Limited**

| Employee name | Title | Currency | Monthly salary | |
| --- | --- | --- | --- | --- |
| | | | Amount | US$ equivalent |
| | | | | |
| TEH Hong Eng | Director, Chairperson | HKD | 200,000.00 | $25,641.03 |
| NG Puay Yee, Annie | Managing Director | HKD | 150,000.00 | 19,230.77 |
| NG Joo Kwee | Director | HKD | 200,000.00 | 25,641.03 |
| NG Joo Puay, Frank | Director | HKD | 160,000.00 | 20,512.82 |
| LEW V Robert | Director | HKD | 30,000.00 | 3,846.15 |
| TAO Kwok Lau, Clement | Director | HKD | 30,000.00 | 3,846.15 |
| NGUYEN Van Tu, Peter | Director | HKD | 30,000.00 | 3,846.15 |
| | | | 800,000.00 | $102,564.10 |
| Exchange Rate: | | | | |
| US$ : HK$ | 7.80000 | | | |

1

| China Fishery Group Limited | | | | |
| --- | --- | --- | --- | --- |
| | | | **Monthly salary** | |
| **Employee name** | **Title** | **Currency** | **Amount** | **US$ equivalent** |
| | | | | |
| TSE, Man Bun | Director | SGD | 4,166.66 | $3,069.45 |
| LIM, Soon Hock | Director | SGD | 4,166.66 | 3,069.45 |
| TAN, Ngiap Joo | Director | SGD | 4,166.66 | 3,069.45 |
| SUNG, Yu Ching | Director | HKD | 50,000.00 | 6,410.26 |
| | | | | $15,618.62 |
| Exchange rate : | | | | |
| US$ : S$ | 1.35746 | | | |
| US$ : HK$ | 7.80000 | | | |

2

EXHIBIT I

EXHIBIT I

**CHINA FISHERY GROUP LIMITED (CAYMAN) et. al.**
**30 DAY CASH FLOW PROJECTION**
**(in USD)**

| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|---|
| | | NS Hong | PAIH | Super Investment | CFGL | Smart Group | CFG Peru Inv | Protein Trading | South Pacific |
| | | N.S. Hong Investment (BVI) Limited (a) | Pacific Andes International Holdings Limited (Bermuda) | Super Investment Limited (Cayman) | China Fishery Group Limited (Cayman) | Smart Group Limited (Cayman) | CFG Peru Investment Pte. Ltd. (Singapore) | Protein Trading Limited (Samoa) | South Pacific Shipping Agency Ltd. (BVI) |
| **Receipt** | | | | | | | | | |
| Interest Income - Related party loans | (1) | $ - | | $ | | $ - | $ - | $ | - |
| IT - shared services fee - related parties | (2) | - | - | - | - | - | - | - | - |
| Rental Income | | - | - | - | - | - | - | - | - |
| **Total Receipts** | | - | - | - | - | - | - | - | - |
| **Cash outflow** | | | | | | | | | |
| **Vessel Operating Expenses/Cost of Sales** | | | | | | | | | |
| Bunker fuel | | - | - | - | - | - | - | - | 426,308 |
| Crew wages and bonuses | | - | - | - | - | - | - | - | 300,000 |
| Spares and stores | | - | - | - | - | - | - | - | 153,221 |
| Vessels miscellanous expenses | | - | - | - | - | - | - | - | - |
| total - vessel cost of sales | | - | - | - | - | - | - | - | 879,529 |
| **General & Admin** | | | | | | | | | |
| Electicity and water | | - | - | - | - | - | - | - | - |
| Legal and professional | | - | 442,627 | - | - | - | - | - | - |
| Listing fee | | - | - | - | 34,575 | - | - | - | - |
| IT Shared service Fee - related party | | - | - | - | 13,462 | - | - | - | - |
| Office salaries | | - | 102,564 | - | 15,631 | - | - | - | - |
| Printing and stationery | | - | 12,821 | - | - | - | - | - | - |
| Management fee | | - | - | - | - | - | - | - | - |
| total General & Admin | | - | 558,011 | - | 63,668 | - | - | - | - |
| **Total cash outflows** | | - | 558,011 | - | 63,668 | - | - | - | 879,529 |
| Surplus/(Deficit) | | - | (558,011) | - | (63,668) | - | - | - | (879,529) |
| Beginning Cash | | 47,854 | 47,887 | 747 | 15,749 | - | - | 30,682 | 21,959 |
| Ending Cash - end of month | | $ 47,854 | $ (510,124) | $ 747 | $ (47,919) | $ - | $ - | $ 30,682 | $ (857,570) |

EXHIBIT I

**CHINA FISHERY GROUP LIMITED (CAYMAN) et. al.**
**30 DAY CASH FLOW PROJECTION**
**(in USD)**

| | | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|---|---|
| | | CFIL | Chanery | Champion | Growing | Target Shipping | Fortress | Ocean | CFG-Singapore |
| | | China Fisheries International Limited (Samoa) | Chanery Investment Inc. (BVI) | Champion Maritime Ltd (BVI) | Growing Management Limited (BVI) | Target Shipping Limited (HK) | Fortress Agents Limited (BVI) | Ocean Expert International Limited (BVI) | CFGL (Singapore) Private Ltd |
| **Receipt** | | | | | | | | | |
| Interest Income - Related party loans | (1) | $ 874,000 | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| IT - shared services fee - related parties | (2) | - | - | - | - | - | - | - | 538,050 |
| Rental Income | | - | - | - | - | - | - | - | 11,403 |
| **Total Receipts** | | 874,000 | - | - | - | - | - | - | 549,453 |
| **Cash outflow** | | | | | | | | | |
| **Vessel Operating Expenses/Cost of Sales** | | | | | | | | | |
| Bunker fuel | | - | - | - | - | - | - | - | |
| Crew wages and bonuses | | - | - | - | - | - | - | - | |
| Spares and stores | | - | - | - | - | - | - | - | |
| Vessels miscellaneous expenses | | - | - | - | - | - | - | - | |
| total - vessel cost of sales | | - | - | - | - | - | - | - | - |
| **General & Admin** | | | | | | | | | |
| Electricity and water | | | | | | | | | 280 |
| Legal and professional | | | | | | | | | |
| Listing fee | | | | | | | | | |
| IT Shared service fee - related party | | 31,620 | - | - | - | - | - | - | 538,050 |
| Office salaries | | | 361 | | | | | | |
| Printing and stationery | | | | | | | | | |
| Management fee | | | 1,894 | | | | | | 2,862 |
| total General & Admin | | 31,620 | 2,255 | - | - | - | - | - | 541,193 |
| **Total cash outflows** | | 31,620 | 2,255 | - | - | - | - | - | 541,193 |
| Surplus/(Deficit) | | 842,380 | (2,255) | - | (10) | - | - | - | 8,261 |
| Beginning Cash | | 6,342 | - | 17,081 | - | - | (10) | - | 39,349 |
| Ending Cash - end of month | | $ 848,723 | $ (2,255) | $ 17,081 | $ (10) | $ - | $ (10) | $ - | $ 47,609 |

Page 2

EXHIBIT I

CHINA FISHERY GROUP LIMITED (CAYMAN) et. al.
30 DAY CASH FLOW PROJECTION
(in USD)

| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|
| NS Hong | PAIH | Super Investment | CFGL | Smart Group | CFG Peru Inv | Protein Trading | South Pacific |
| N.S. Hong Investment (BVI) Limited (a) | Pacific Andes International Holdings Limited (Bermuda | Super Investment Limited (Cayman) | China Fishery Group Limited (Cayman) | Smart Group Limited (Cayman) | CFG Peru Investment Pte. Ltd. (Singapore) | Protein Trading Limited (Samoa) | South Pacific Shipping Agency Ltd. (BVI) |

Notes:

(1) CFIL previously derived revenue through long term supply agreements pursuant to which the counterparties had obligations to pay certain amounts to CFIL. Those agreements were terminated in 2014. On a go forward basis, CFIL's revenue will consist of interest payments from CFG Investment S.A.C. In that regard, CFIL loaned funds to CFG Investment S.A.C. Loan proceeds were used by CFG Investment S.A.C. to acquire its 7% quota for the Peruvian anchovy business.

- The outstanding principal balance and portions of the accrued interest are included in the Debtor's Intercompany - Trade Receivables general ledger account. The total principal outstanding is $446,500,168, in which a balance of $261,875,000 of the total principal outstanding is entitled to interest at 4% per annum.

- Total interest accrued and unpaid through 6/30/16 is $11,818,307.62. The $874,000 amount included in the 30 day projection represents the interest that will accrue on the loan in the next thirty days. Although the amount due and owing by the borrower under the loan is well in excess of $874,000, management has included a conservative estimate of one month's interest in its projection. Ultimate payment by the borrower is contingent on funds being made available by the borrower under its local regulatory requirements; and the borrower's financial wherewithal to pay. Both are outside of the Debtor's control.

(2) To improve operating efficiencies, the Debtors centralize their computer networking, servicing and licensing in Paramount Holdings, Limited, a partially owned subsidiary of PAIH. Paramount charges each company based on its actual usage. The $538,050 projected shared services fee relates to one time set up fee for the Peruvian entities for services performed in April/May 2016.

CHINA FISHERY GROUP LIMITED (CAYMAN) et. al.
30 DAY CASH FLOW PROJECTION
(in USD)

EXHIBIT 1

| 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 |
|---|---|---|---|---|---|---|---|
| CFIL | Chanery | Champion | Growing | Target Shipping | Fortress | Ocean | CFG-Singapore |
| China Fisheries International Limited (Samoa) | Chanery Investment Inc. (BVI) | Champion Maritime Ltd (BVI) | Growing Management Limited (BVI) | Target Shipping Limited (HK) | Fortress Agents Limited (BVI) | Ocean Expert International Limited (BVI) | CFGL (Singapore) Private Ltd |